IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VISKASE COMPANIES, INC.,                    )
                                            )
          Plaintiff,                        )
                                            )
     v.                                     )    No. 09 C 5022
                                            )
WORLD PAC INTERNATIONAL AG and WORLD        )
PAC INTERNATIONAL USA, and SUN              )
PRODUCTS MARKETING UND MANUFACTURING        )
AG,                                         )
                                            )
          Defendants.                       )
_____         )
WORLD PAC INTERNATIONAL USA,                )
                                            )
     Defendant/Counter-Plaintiff,           )
                                            )
     v.                                     )
                                            )
VISKASE COMPANIES, INC.,                    )
                                            )
     Plaintiff/Counter-Defendant            )

MEMORANDUM OPINION AND ORDER

     The parties in this case are competitors in the manufacture and
sale of food casings used in the production of sausages and other
meat products, cheeses, and other processed foods.  On August 14,
2009, plaintiff Viskase Companies filed suit against defendants
seeking, *inter alia*, a declaratory judgment that it does not
infringe U.S. Patent No. 6,200,613 (the "'613 patent").  The '613
patent relates to a type of food casing claimed to be novel for its
multi-layered composition, which allows the casing to transfer color
and flavor to the encased food while preventing the loss of weight,
flavor or taste during the food's processing.  Because the parties

disagree as to the meaning of certain terms used in the claims-in-suit, this opinion construes those terms pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).

I.

"[T]he interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for the court." *Markman,* 52 F.3d 967 at 970-71. Claim terms "are generally given their ordinary and customary meaning," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), which is to say the meaning those words would have to a person of ordinary skill in the art at the time of the patent's effective filing date.[1] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). The so-called "intrinsic evidence," i.e., the claim language itself, the patent's specification, and its prosecution history, is of paramount significance in construing disputed terms. While "extrinsic evidence," i.e., everything else, may be helpful to understand the meaning of technical or scientific terms, such evidence is considerably less reliable than intrinsic evidence for determining "the legally operative meaning of claim language," *Phillips*, 415 F.3d at 1317 (citation omitted).

---

[1]Any references here to a person of "skill in the art" refer to a person of ordinary skill in the art at the relevant time.

Analysis of the intrinsic evidence always begins with the language of the claims. *Vitronics* 90 F.3d 1576 at 1582.  Next comes the patent specification, which "is always highly relevant to the claim construction analysis." *Phillips*, at 1314 (*quoting Vitronics*, at 1582).  Nevertheless, "limitations from the specification are not to be read into the claims." *Golight, Inc., v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004)(citations omitted).  While a patentee is free to be his or her own lexicographer and ascribe a special definition to a given term, "any special definition given to a word must be clearly defined in the specification." *Markman*, 52 F.3d at 980. Like the specification, the prosecution history is considered reliable evidence of the meaning of claim terms, but it too "cannot 'enlarge, diminish, or vary'" the limitations in the claims. *Id*. (quoting *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227 (1880)).

With these general principles in mind, I turn to the claim terms in dispute.

## II.

### 1. barrier casing

Plaintiff asserts that "barrier casing" as used in the claims means "an airtight and gastight casing."  Defendants believe that this term does not require judicial construction, but argue that if I do construe the term, I should give it the meaning, "a casing

intended to substantially restrict the entrance or exit of one or more substances."

The word "barrier" is commonly understood to laypeople as an obstacle or a restriction (police and traffic barriers spring to mind as physical examples, while more figurative examples include trade barriers and language barriers), and I am not persuaded that a person of skill in the art would understand the term as it is used in the '613 patent in some other, esoteric sense.

In reality, the parties' dispute is over the meaning of "impermeable," which I address below.  At oral argument, plaintiff insisted that failure to construe the term "barrier" would give rise to disputes later on about whether "barrier" was used the same way in the '613 patent as it was in certain prior art.  This issue is appropriately left to the invalidity/unenforceability inquiry, however, and does not render the plain meaning of "barrier" unclear.  Accordingly, I decline to construe the term "barrier," which is to be given its ordinary and customary meaning.

### 2. "Steam and/or Gas Impermeable"

Plaintiff seeks to construe this term as "not permeable to steam and/or gas," while defendants propose the construction, "having a low enough permeability or transmission rate to steam and/or gas so as to be considered a high barrier to steam and/or gas, respectively, that prevents a measurable loss of weight,

flavor, and/or taste during customary production, cooking, and storage." Neither of these proposals is wholly satisfactory.

As the parties acknowledge, the real dispute is whether "impermeable" should be construed in an absolute sense, or, instead, in a functional sense, with reference to the invention's purpose. Plaintiff's proposed construction, which merely replaces the inherent negative in the word "impermeable" with a two-word negative phrase, does nothing to clarify the definition or scope of the disputed term. On the other hand, defendants' proposal is replete with relative terms, some of which ("so as to be considered a high barrier") appear to add nothing to the definition and are presumably geared toward invalidity arguments.

Plaintiff's argument for an absolute construction of "impermeable" finds some support in the intrinsic evidence. First, plaintiff rightly notes that the claim language uses the term "impermeable" without a modifier such as "substantially," or "virtually," which would have made clear that a casing with some minimal degree of permeability falls within the scope of the claim. Also, the specification underscores that "there is no loss in weight *at all* during the manufacturing process, storage and transport." '613 patent at 2:65-66. (Emphasis added) This language echoes the superlative used in the abandoned parent application of the '613 patent, which disclosed that "[n]o losses *whatsoever* occur in the weight, taste, and flavoring" of the enclosed food. (Emphasis

added) The emphatic use of the phrases "at all" and "whatsoever" is indeed suggestive of an absolute quality.

On the other hand, these terms must be understood in context. The discussion of the prior art in the '613 patent's specification first describes the use of cellulose fiber casings, and explains that "due to the steam and gas permeability of the casing, the production of food in a cellulose fiber casing is always associated with a loss in weight, taste and flavor." '613 patent at 1:27-29. The specification goes on to discuss pure plastic casings that were developed in the prior art "[t]o avoid the disadvantage of steam and gas permeability," and it describes such casings as having "a steam and gas impermeability." *Id.* at 1: 39-42. The patent then explains that "[w]hen using plastic casting (sic) of this type, there is no loss in weight, flavor and taste during the production process nor during storage and shipping." *Id.* at 1:44-45.

Indeed, the patent repeatedly identifies permeability (or impermeability) as the feature that determines whether losses in weight, taste and flavor occur, and the concepts are linked throughout the patent. For example, in the detailed description of the invention, the specification states, "[s]ince the outer layers of the casing are impermeable, the substances cannot be rinsed out during the boiling process. No losses in weight, taste and flavor result during the production and boiling process or during transport and storage." '613 patent at 4:30-34. No other definition of

"impermeable" is offered, nor is the term linked with any object other than that of preventing losses in weight, taste, and flavor. Therefore, it is reasonable to conclude that the patentee defined "impermeable" with reference to that object.

Moreover, plaintiff does not appear to dispute that the pure plastic casings in the prior art, which the '613 patent characterizes as "impermeable," are not, in fact, impermeable in the strict sense, since some transmission of air, gas, or both would be observed if such casings were submitted to certain types of testing.[2]  The '613 patent nevertheless described the plastic casings as "impermeable" by contrast to the cellulose casings known in the art (the permeability of which "always" resulted in losses in weight, taste and flavor) because the plastic casings effectively prevented such losses.  Because "claim terms are normally used consistently throughout the patent," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), it is reasonable to presume that the word "impermeable" as used in the claims has the same meaning as "impermeable" as applied to the less-than-absolutely impermeable pure plastic casings discussed in the specification.

Plaintiff cites *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004), in support of the argument that because claim terms "should be taken as they appear," an absolute

_____

[2]At oral argument, defendants argued that "over time everything [polymeric] is permeable to steam and/or oxygen."  Plaintiff does not dispute this proposition.

construction of impermeable is appropriate.  In *Chef America*, the court considered a patent relating to a process for baking dough so as to achieve a "light, flaky, crispy texture."  As written, the claims required "heating the...dough to a temperature in the range of about 400° F to 850° F."  The patentee sought a construction in which this temperature range referred to the temperature of the oven, not to the temperature of the dough itself, on the ground that if applied to the dough, the process would result in a burnt crisp, rather than achieve the stated object of a "light, flaky" product. But the court concluded that the claim language unambiguously required heating the *dough*, not the *oven*, to the specified temperature range, and held that courts may not redraft claim terms simply to avoid a "nonsensical result."

Plaintiff argues that under *Chef America*, I should construe "impermeable" in its absolute sense, regardless of whether such a construction would be, in defendants' words, "impractical" because no food casing in the world achieves 100% impermeability.  But whether an absolutely impermeable food casing exists or could exist is beside the point.  The point is that the manner in which "impermeable" and related words are used throughout the patent reveal that the patentee defined those words by reference to the quality of preventing losses in weight, taste and flavor.  Because this consideration--not merely the desire to avoid a "nonsensical

result"--supports a non-absolute construction, *Chef-America* is not dispositive here.

Plaintiff's citation to *Aqua-Aerobic Sys., Inc. v. Aerators, Inc.*, 211 F.3d 1241 (Fed. Cir. 2000), has superficial appeal because the terms construed in that case are similar to those at issue here. In *Aqua-Aerobic*, the Federal Circuit affirmed the district court's construction of the phrase "preventing passage of atmospheric air" as requiring that all air be excluded from the system, even though the experts in the case agreed that the system was not absolutely air-tight. The court explained that "the undisputed testimony that experts would understand that the described sealing system would not produce an air-tight device" did not warrant broadening the claims in a manner "directly contrary to the limitations in the claims and the description in the specification." As explained above, however, a less-than-absolute construction of "impermeable" is consistent with, rather than "directly contrary to," the manner in which that word is used in the patent in this case.

Finally, plaintiff objects that the phrase "no measurable losses" begs questions such as, "measurable in what units?", "measurable under what conditions?", and "measurable by whose taste?" and that these open questions render defendants' proposed construction indefinite. It is true that the patent does not establish numeric values for ascertaining losses in weight, nor does it define the conditions under which such losses are measured. But

"a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement." *Oakley, Inc., v. Sunglass Hut Intern.*, 316 F.3d 1331, 1342 (Fed. Cir. 2003) (citing *In re Marosi*, 710 F.2d 799, 802-03 (Fed. Cir. 1983). At oral argument, plaintiff insisted that the indefiniteness of defendants' proposed construction is illustrated by the fact that while the inventor said losses in weight should be measured in tenths of grams, defendants' experts proposed measuring in grams, as well as by defendants' expert's testimony that "customary" production conditions can vary widely. It is in light of these variations that the patent's absolute language takes on meaning, however: *no measurable losses* means no losses as measured in *any* units commonly used as a practical matter in the industry, under *any* of the range of conditions commonly observed there. As for the elements of "taste" and "flavor," while these undoubtedly have subjective components in the abstract, identifying "losses" in these elements when comparing products before and after processing does not seem to me to be so impossibly subjective that it could not be established by any objective criteria.

In sum, although it is true that the patent could have been more precise on this point, I am satisfied, at this stage,[3] that one

---

[3]As the court noted in *Oakley*, in which claim definiteness was raised, as it is here, at the preliminary injunction stage, declining to hold the term indefinite at this stage simply recognizes "the presumption of validity" and does not mean that plaintiff cannot ultimately succeed on the merits of an

skilled in the art would be able to draw the line between a loss and no loss in weight, taste and flavor.

For the foregoing reasons, I conclude that "steam and/or gas impermeable" means "having a low enough permeability or transmission rate to steam and/or gas to prevent a measurable loss of weight, flavor, and taste during customary production, cooking, and storage."

### 3. "plastic foil"

Plaintiff asserts that this term should be construed to mean "plastic film," while defendants seek the construction, "a self-supporting film or sheet of polymeric material." Their dispute ultimately comes down to whether the term requires a plastic film that is "self-supporting."[4]

Defendants insist that the quality of self-support is inherent in the ordinary meaning of the word "foil," pointing to household aluminum foil as an example. While acknowledging that nothing in the claims, the specification, or the prosecution history of the '613 patent explicitly defines "foil" with reference to self-support, defendants emphasize the patent's use of the word "laminate" to describe the foil, and argue that this word makes it clear that only a self-supporting film or sheet of material was

_____

indefiniteness argument later in the litigation.  316 F.3d at 1342.

[4]The parties appear to agree that whether the word "plastic" or the phrase "polymeric material" is used in the definition is immaterial.

contemplated.  Plaintiffs, for their part, argue that nothing in the intrinsic or extrinsic evidence supports importing into the claims the "extraneous" limitation of self-support.

It is true that the word "self-support" cannot be found in the patent.  The patent's use of the term "laminate" in both the claims and the specification does appear to support defendants' construction, however.  At oral argument, defendants explained--and plaintiff did not dispute--that while sheets of material can be laminated together, a liquid (i.e., a non-self-supporting material) cannot.

Plaintiff emphasized, both in its briefs and at oral argument, that the specification teaches the use of polyethylene "in an almost liquid form," arguing that this demonstrates that the plastic foil need not be self-supporting.[5]  But "liquid" polyethylene is disclosed only as the adhesive, inner layer of a multi-layered component collectively referred to in the claims as the "impermeable plastic foil," and does not suggest that the entire foil can be liquid.

Moreover, claim 8, which depends from claim 1, recites, "wherein the impermeable plastic foil (1) comprises at least two foils laminated together... ."  As noted above, "claim terms are normally used consistently throughout the patent," *Phillips v. AWH*

---

[5]Plaintiff also pointed to similar language in claim 9, which claims "one of the polyethylene foils (1c) extruded on wet which functions as an adhesive for joining the absorbent inner layer... ."

*Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005), so if the "foils" of claim 8 can be "laminated together," it is reasonable to conclude, in the absence of specific evidence to the contrary, that the "plastic foil" recited in claim 1 is capable of being laminated, i.e., it is self-supporting.

Both parties direct me to a portion of the prosecution history in which claim 1 was amended to recite, instead of an "impermeable foil," an "impermeable plastic foil."  The parties agree that the reason for the amendment was to distinguish U.S. Patent 4,446,167 ("Smith").  Each side submits that the following passage supports its own construction:

> While the nature of the "barrier coats" of this patent is not clear, the Examiner suggested incorporating into claim 1 a portion of previous claim 7 or 8.  Accordingly, new claim 11 incorporates the plastic foil of the first portion of previous claim 7.  The remainder of claim 7 has been rewritten as new claim 13 with the modification proposed by the Examiner of using the term "laminated" in place of "joined together so as to be flat" for clarity.... It is submitted that these new claims with their plastic foils clearly distinguish over the barrier coats of the above patent.

'613 File History, Exh. F to Viskase's opening claim construction brief, p. 62-63.[6]

The parties present conflicting interpretations of this portion of the file.  In an earlier iteration of the referenced claims, claim 1 included the phrase "impermeable foil," while claim 7 recited a "tight plastic foil."  Plaintiff contends that the

---

[6]This page number refers to the numbering generated by the ECF system for this exhibit, which is Docket No. 64-2.

patentee's insertion of the word "plastic" in claim 1 was the reason the examiner allowed the new claim over Smith.  Defendants insist that it was the self-supporting nature of the plastic *foil* of claim 1 that was the basis for overcoming the barrier *coat* of Smith, reasoning that Smith (and other prior art) previously disclosed the use of plastic, so that the insertion of "plastic" could not have been the basis for overcoming Smith, and explaining that the word was inserted for clarity in response to the examiner's suggestion of incorporating part of claim 7 into claim 1.  Frankly, both interpretations are plausible.  Standing alone, the cited excerpt does not unambiguously support one construction or the other.

In short, I conclude that the use of the word "laminate" in conjunction with the foils described and claimed in the patent supports defendants' proposed construction, and that neither plaintiff's argument about the use of liquid polyethylene, nor the ambiguous language in the prosecution history, is a sufficient basis for second-guessing the apparent meaning of the words in the patent itself.  Accordingly, I construe "plastic foil" as "a self-supporting film or sheet of plastic."

### 4. "The inner layer comprising fibers selected from the group consisting of woven fibers, fabrics, knits and fleece"

The parties' dispute centers on the term "fabric."  According to plaintiff, "fabric" means "a cloth made by weaving, knitting, or felting fibers."  Plaintiff additionally proposes that "[t]he following materials are excluded from the 'group consisting of:'

individual fibers, tissue, and non-woven fabric." For their part, defendants construe "fabric" as "a sheet-like material produced from woven fibers, knitted fibers, or non-woven matted fibers."

Understanding the rationale for plaintiff's proposal requires a certain amount of mental gymnastics. Plaintiff begins straightforwardly enough, identifying as a Markush group the limitation introduced by the phrase "group consisting of." *See Abbott Laboratories v. Baxter Pharmaceutical*, 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C.") Plaintiff then argues that everything not included in the Markush group "woven fibers, fabric, knits, and fleece" is excluded from the group. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005)(phrase "group consisting of" signals Markush group, which "by its nature is closed"). This portion of plaintiff's argument is unobjectionable. Thereafter, however, the argument becomes more tenuous.

Plaintiff's next proposition is that "as a matter of grammar, 'woven' modifies each of the types of fibers in the claimed *Markush* group, including fabric." Plaintiff's reply brief, at 12. In other words, plaintiff parses the limitation "woven fibers, fabrics, knits and fleece" as claiming "woven fibers, [woven] fabric, [woven] knits, and [woven] fleece." If plaintiff applied its proposed rule

15

of grammar to an earlier iteration of the Markush group, however
(the '285 application claimed "the group consisting of individual
fibers, woven fibers, fabric, knits, and fleece"), the limitation
would be read to claim "individual fibers, [individual] woven
fibers, [individual] fabric, [individual] knits, and [individual]
fleece." Plaintiff does not suggest that the claim as it appeared
in the '285 application should be given such an implausible
construction; yet that is the only interpretation available under
plaintiff's proposed rule of grammar.

Plaintiff also cites the description in the specification of
an absorbent layer "comprising individual fibers or a weave, fabric,
knit, preferably a fleece," and argues that the "or" in this phrase
reveals an intent to contrast individual fibers (including non-woven
materials) with various types of woven materials (including fabric).
This taxonomy, the argument goes, demonstrates that the patentee
implicitly excluded "non-woven fabric" from the group of materials--
weave, fabric, knit, and fleece--named on the far side of the "or."
However, this exceedingly strained interpretation imbues the
structure of the phrase with far too much substantive meaning.

Finally, plaintiff argues that the chart reproduced below,[7]
which purports to show the "progression" of certain claims over the

---

[7]I reproduce plaintiff's chart as it was presented at oral
argument. A similar chart that misquoted the issued claim in a way
that does not appear to be material to plaintiff's argument was
presented in plaintiff's brief.

course of the prosecution history reveals that the patentee intended to surrender non-woven materials:

| '184 Application Claim 3 (Abandoned) | '285 Application Claim 1 (Cancelled) | '613 Patent Claim 1 (Issued) |
|---|---|---|
| the group consisting of *fleece, <u>non-woven fabric</u>, woven fabric, knit fabric and film* | the group consisting of *<u>individual fibers</u>, woven fibers, fabric, knits, and fleece,* | the group consisting of *woven fibers, fabric, knits, and fleece,*[1] |

According to plaintiff, this chart demonstrates that the patentee replaced the term "non-woven fabric" with the term "individual fibers," so that the later surrender of "individual fibers" effectively disclaimed non-woven fabric.

Defendants, of course, tell a different story. According to them, the "individual fibers" claimed in the '285 application were not a substitute for the term "non-woven fabric" in the '184 application. Instead, the word "fabric" in the '285 application was used in place of "non-woven fabric, woven fabric, [and] knit fabric," while "individual fabric" was claimed (and later abandoned) as a separate matter in the '285 application.

While both interpretations are perhaps plausible, defendants' explanation is the more obvious. In any event, disavowal of claim scope requires a far clearer statement of intention than the ambiguous inferences that might be drawn under plaintiff's analysis. *See Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (disavowal of claim scope based on prosecution

history must be unmistakable and unambiguous). *Abbott Laboratories, v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009), on which plaintiff relies to support its theory that the patentee disclaimed non-woven fabric when it disclaimed individual fibers, is not to the contrary.

In *Abbott*, the patentee first filed an application that described and claimed Crystal A and Crystal B, then filed a later application (which issued as the patent-in-suit in that case) with broader claims that arguably encompassed both Crystal A and Crystal B, but whose specification referred only to Crystal A. The *Abbott* court upheld a construction confining the scope of the claims-in-suit to Crystal A, reasoning that because "Abbott knew exactly how to describe and claim Crystal B compounds," but did not do so, the claims were properly limited to Crystal A. *Id.* at 1289.

Plaintiff's reliance on *Abbott* here oversimplifies the *Abbott* court's holding, which was based on language in the specification that identified *the invention* as Crystal A. Because the written description revealed that "Crystal A was synonymous with the invention," the court applied the exception, rather than the rule against importing limitations from the specification into the claims. In this case, the specification provides no such clear basis for excluding non-woven fibers from the scope of the invention.

For all of these reasons, I reject plaintiff's proposed construction. Plaintiff does not appear to contest defendants'

proposal, other than to the extent it covers non-woven fabric. Because I find that non-woven fabric appropriately falls within the scope of the term "fabric" as used in the '613 patent, however, I adopt defendants' construction of the term as "a sheet-like material produced from woven fibers, knitted fibers, or non-woven matted fibers."

## 5. "In an amount sufficient to impart color and/or flavor to the foodstuff"

Defendants ask me to construe this term as, "enough coloring and/or flavoring agent is provided such that desired color and/or flavor effect is produced in the foodstuff when the foodstuff is stuffed and boiled, cooked, or otherwise heated in the casing." Plaintiff offers no alternative construction, arguing that the claim term is indefinite under 35 U.S.C. § 112 ¶ 2. Plaintiff also objects to defendants' proposed construction on a number of grounds.

The standard for determining whether a patent claim is sufficiently definite to satisfy 35 U.S.C. § 112 ¶ 2 is whether "one skilled in the art would understand the bounds of the claim when read in light of the specification." *Exxon Research and Engineering Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). This standard "does not compel absolute clarity," and "[o]nly claims "'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)(quoting *Exxon*, 265 F.3d at 1375). "If the claims read in light of the specification reasonably apprise those skilled in

19

the art of the scope of the invention, § 112 demands no more."
*Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed.
Cir. 2003) (quoting *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d
870, 875 (Fed.Cir.1993)).

Plaintiff raises two basic arguments for holding this claim
term indefinite.  First, it contends that because the '613 patent
discusses the inferiority of previously known pure plastic casings
based on the latter's inability to "adequately absorb and store
impregnating agents," ascertaining the proper scope of this claim
term requires reference to "a standard by which to measure the
degree of flavor or color transfer," but that none exists in the
intrinsic record.  Next, plaintiff argues that because flavor is an
inherently subjective concept, the claim term has "no objective
anchor" and is "insolubly ambiguous."

In support of these arguments, plaintiff relies on *Halliburton
Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008),
and *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347
(Fed. Cir. 2005).  In *Halliburton*, the court concluded that the
claim term "fragile gel" was indefinite because although the
patentee distinguished its invention based on the use of a "fragile
gel," it provided no consistent way "to distinguish the fragileness
of the invention from disclosed prior art."  514 F.3d at 1256.
Plaintiff argues that the '613 claims are similarly indefinite
because a person of skill in the art could not distinguish the

20

amount of flavoring or coloring agents described in the patent from
the inadequate amounts alleged to be found in the prior art.  As the
*Halliburton* court recognized, when a claim term is defined in
functional language (i.e., "by what it does, rather than what it
is," 514 F.3d at 1255 (citing *In re Swinehart*, 439 F.2d 210, 212
(1971)), "whether that limitation is sufficiently definite is a
difficult one that is highly dependent on context." *Id*. Here, the
claim itself imposes parameters on the scope of the phrase
"sufficient amount" with reference to what it does ("impart color
and/or flavor").

Defendants explain that the invention can be practiced so as
to transfer a range of colors ("light caramel color" or "dark
caramel color" for example) or flavors, and that one of skill in the
art would know how to achieve a variety of results.  According to
the patent, *none* of these results was possible using the pure
plastic casings in the prior art, regardless of the amount of
coloring or flavoring used.  That the claims encompass a range of
results superior to those available in the prior art does not render
the claim scope indefinite under *Halliburton*.

Nor is the claim term so inherently subjective as to be
"insolubly ambiguous" under *Datamize*.  In that case, the Federal
Circuit held that the phrase "aesthetically pleasing" was indefinite
because its inherent subjectivity "fail[ed] to provide one of
ordinary skill in the art with any way to determine" whether the

limitation was met.   417 F.3d at 1349.   The claim term at issue here is not similarly devoid of any objective anchor.   For example, defendants point to objective tests for flavor discussed by their expert at his deposition: "[Y]ou could in the earlier days rely on a suitable taste panel.   The state of the art has advanced considerably since those days.   Nowadays, I might use a highly sophisticated instrument to determine that, what the composition of the flavoring components are."   Although the patent itself makes no reference to these or other tests that may be used, plaintiff does not dispute that such tests were known to, and used by, those of skill in the art.   The fact that the tests may incorporate a subjective component does not render the claim term incapable of construction under *Datamize*.

In sum, I do not find at this stage that the term "in an amount sufficient to impart color and/or flavor to the foodstuff" is indefinite.   Nevertheless, I agree with plaintiff that there is no basis for construing the term to include the phrase "when the foodstuff is stuffed and boiled, cooked, or otherwise heated in the casing" in the definition of the term.   The only temporal limitation in the claim itself is "when the food barrier casing encloses the foodstuff," and defendants have articulated no argument for redefining this portion of the phrase.

III.

For the foregoing reasons, the terms submitted by the parties for judicial construction will have the meanings set forth above.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated:  May 18, 2010