IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VISKASE COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: 09-CV-5022 |
| v. | ) | |
| | ) | |
| WORLD PAC INTERNATIONAL AG and | ) | JUDGE ELAINE BUCKLO |
| WORLD PAC INTERNATIONAL USA, AND | ) | |
| SUN PRODUCTS MARKETING UND | ) | JURY TRIAL DEMANDED |
| MANUFACTURING AG, | ) | |
| Defendants. | ) | |
| WORLD PAC INTERNATIONAL USA, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| VISKASE COMPANIES, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant. | ) | |

**DEFENDANTS' COMBINED MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 2

  A.  World Pac's Invention .................................................................................... 2

  B.  Viskase's Products ......................................................................................... 5

  C.  Viskase's Refusal to Provide Samples........................................................... 9

  D.  Viskase's Reverse Engineering Efforts Continued After Learning
      of the '613 Patent ......................................................................................... 10

  E.  Viskase Finally Makes Significant Sales to World Pac's Customer ............... 10

  F.  World Pac's Continued Efforts to Obtain Samples in the Market
      Were Fruitless and Otherwise Thwarted by Viskase.................................... 12

  G.  Independent Test Results Showed that VISCOAT Casings Infringe
      the '613 Patent ............................................................................................ 14

  H.  Materials of Construction Could not be Determined without
      Sophisticated Analytical Instrumentation and Tests.................................... 15

  I.  Viskase's Continued and Enhanced Efforts to Sell to World Pac's
      Customers..................................................................................................... 16

III. ARGUMENT........................................................................................................ 18

  A.  Standard for Preliminary Injunction ............................................................ 18

  B.  World Pac is Likely to Succeed on the Merits of its Counterclaim............... 19

    1.  High Likelihood of Success of Proving Infringement ............................. 20

      a)  The VISCOAT Casings are Demonstrably "Impermeable".................. 22

      b)  Viskase's VISCOAT Casings are Necessarily Impregnated
          with a Sufficient Amount of Coloring and/or Flavoring Agents ........... 28

    2.  High Likelihood of Success Demonstrating Validity in View
        of Viskase's Insufficient Challenge.......................................................... 29

      a)  Viskase's Anticipation Argument Fails Because None of
          the References Cited Discloses Each and Every
          Element of the Claims ...................................................................... 31

  b) Viskase Has Failed to Meet its Burden to Demonstrate
   Obviousness as a Matter of Law ................................................. 35

  c) Viskase Similarly Ignores the Overwhelming Secondary
   Considerations that Refute its Claim of Obviousness....................... 38

 3. Viskase's Argument that the '613 Patent is Unenforceable
  Due to Inequitable Conduct is Misplaced and Untimely........................ 42

C. World Pac Will be Irreparably Harmed if an Injunction Does not Issue ........ 48

 1. Viskase's Continuing Infringement Injures any Collateral
  Benefit Provided by the Patent Other than a Right to
  Receive Money Damages ........................................................ 49

 2. Viskase's Continuing Infringement Likely Could Encourage
  Others to Infringe ................................................................ 51

 3. Viskase's Continuing Infringement Threatens Survival of
  World Pac's Business ............................................................ 52

 4. World Pac and Viskase are Direct Competitors Trying to
  Influence the Same Group of Customers ...................................... 53

 5. Viskase's Argument that World Pac Delayed in Alleging
  Infringement is Simply Wrong ................................................. 54

  a) Without a Sample it Could Test, World Pac was Precluded
   from Bringing Suit without Inviting Sanctions.......................... 55

  b) Courts Have Granted Injunctions Even Where Delay Before
   Filing Was Substantial....................................................... 58

  c) Even Viskase's Expert Concedes that Materials of Construction
   Could Not be Determined Without Sophisticated Tests ................. 60

  d) Viskase Inappropriately Relies on Trade Show Displays to Support
   an Inference that World Pac Delayed Enforcing its Rights................. 62

 6. Duplication of Unique Features of World Pac's Casing Further
  Supports Finding of Irreparable Harm......................................... 63

D. Balance of the Hardships Weighs in World Pac's Favor.............................. 64

E. Impact of the Injunction on the Public Interest is Favorable to World Pac .......... 66

IV. CONCLUSION............................................................................. 68

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbot Labs. v. Sandoz, Inc.,*
  500 F. Supp. 2d 807 (N.D. Ill. 2007) ............................................................19, 64

*Abbott Labs. v. Sandoz,*
  544 F.3d 1341 (Fed. Cir. 2008) ................................................20, 36, 64, 67

*Am. Hoist & Derrick v. Sowa & Sons, Inc.,*
  725 F.2d 1350, 220 U.S.P.Q. 763 (Fed. Cir. 1984) ......................................... 30

*Automated Merch. Sys. v. Crane Co.,*
  2009 U.S. App. LEXIS 27667 (Fed. Cir. Dec. 16, 2009) .................................... 49

*Baskin-Robbins Inc. v. Patel,*
  264 F. Supp. 2d 607 (N.D. Ill. 2003) ............................................................ 64

*Cummins-Allison Corp. v. Glory Ltd.,*
  2003 U.S. Dist. LEXIS 2151 (N.D. Ill 2003) .................................................... 58

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,*
  851 F.2d 1387 (Fed. Cir. 1988)...............................................................38, 39

*Dow Jones & Co., Inc. v. Ablaise Ltd.,*
  632 F. Supp.2d 23 (D.D.C. 2009)................................................................. 35

*Dudley v. HealthSource Chiropractic, Inc.,*
  585 F. Supp. 2d 433 (W.D.N.Y. 2008) ............................................................ 59

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006).............................................................................19, 49

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.,*
  168 F.3d 28 (Fed. Cir. 1999)...................................................................... 44

*Erico Int'l Corp. v. Vutec Corp.,*
  516 F.3d 1350 (Fed. Cir. 2008) ................................................................... 19

*Ethicon Endo-Surgery v. United States Surgical Corp.,*
  149 F.3d 1309 (Fed. Cir. 1998).................................................................... 26

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
  575 F.3d 1312 (Fed. Cir. 2008) ................................................................42, 43

*Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC,*
   350 F.3d 1327 (Fed. Cir. 2003) ............................................................................ 42

*FMC Corp. v. Control Solutions, Inc.,*
   369 F. Supp. 2d 539 (E.D. Pa. 2005) .................................................................... 59

*Genentech, Inc. v Novo Nordisk A/S,*
   108 F.3d 1361 (Fed. Cir. 1997) ............................................................................ 31

*Hearing Components, Inc. v. Shure, Inc.,*
   2009 U.S. Dist. LEXIS 17168 (E.D. Tex. Mar. 6, 2009) ...................................... 37

*Henkel Corp. v. Coral, Inc.,*
   754 F. Supp. 1280 (N.D. Ill 1990) ...................................................... 59, 60, 65, 66

*Hybritech, Inc. v. Abbott Labs.,*
   849 F.2d 1446 (Fed. Cir. 1988) .....................................................................passim

*In re Bond,*
   910 F.2d 831, 15 USPQ2d 1566 (Fed. Cir. 1990) ................................................ 31

*In Re Dembiczak,*
   *175 F.3d 994 (Fed. Cir. 1999)* ............................................................................ 37

*Jacobson v. Cox Paving, Co.,*
   U.S. Dist. LEXIS 17787 (D. Ariz. May 16, 1991) ............................................... 59

*Judin v. U.S.,*
   110 F.3d 780 (Fed. Cir. 1997) .............................................................................. 56

*KSR Int'l Co. v. Teleflex, Inc.,*
   550 U.S. 398 (2007) .......................................................................... 35, 36, 37, 38

*Medtronic, Inc. v. AGA Med. Corp.,*
   2009 U.S. Dist. LEXIS 36171 (N.D. Cal. April 28, 2009) ................................... 36

*Micromesh Techn. Corp. v. Am. Recreation Prods., Inc.,*
   2007 U.S. Dist. LEXIS 64241 (N.D. Cal. Aug. 30, 2007) .................................... 56

*Net MoneyIN, Inc. v. Verisign, Inc.,*
   545 F.3d 1359 (Fed. Cir. 2008) ............................................................................ 31

*Oakley, Inc. v. Sunglass Hut Int'l,*
   316 F.3d 1331 (Fed. Cir. 2003) ...................................................................... 20, 30

*Panduit Corp. v. Band-It-Idex, Inc.,*
   2000 U.S. Dist. LEXIS 11111 (N.D. Ill. June 23, 2000) ................................. 37, 38

iv

*Perricone v. Medicis Pharm. Corp.*,
   539 F. Supp.2d 571 (D. Conn. 2008)................................................................. 36

*Pittway v. Black & Decker*,
   667 F. Supp. 585 (N.D. Ill. 1987)..................................................................... 50

*Power-One, Inc. v Artesyn Techn., Inc.*,
   2010 U.S. App. LEXIS 6487 (Fed. Cir. Mar. 30, 2010)..............................39, 41

*Pressure Products Med. Supplies, Inc. v. Greatbatch Ltd.*,
   No. 2008-1602, 2010 U.S. App. LEXIS 6132 (Fed. Cir. Mar. 24, 2010)........31, 39

*Proctor & Gamble v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009)........................................................................ 38

*Purdue Pharma L.P. v. Boehringer Ingelheim*,
   237 F.3d 1359 (Fed. Cir. 2001)...................................................................... 53

*Purdue Pharma, L.P. v. Endo Pharm., Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006)...................................................................... 45

*Ranbaxy Labs. v. Andrx Pharm., Inc.*,
   2005 U.S. Dist. LEXIS 27753 (N.D. Ill. Nov. 10, 2005) ...............................passim

*Read Corp. v. Viper Int'l*,
   1996 U.S. App. LEXIS 3847 (Fed. Cir. 1996)................................................ 58

*Rotec Indus., Inc. v. Mitsubishi Corp, et al.*,
   215 F.3d 1246 (Fed. Cir. 2000)...................................................................... 62

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006)...................................................................... 53

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008)...................................................................... 44

*Stuart W. Johnson & Co. v. Ro-Ber, Inc.*,
   1967 U.S. Dist. LEXIS 8000 (N.D. Ill. 1967).................................................. 31

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
   492 F.3d 1350 (Fed. Cir. 2007)...................................................................... 35

*Techtronic Indus. Co., Ltd. et al. v. Chevron Holdings Ltd., et al.*,
   395 F. Supp 2d 720 (N.D. Ill. 2005).......................................................19, 49, 63

*Whistler Corp. v. Dynascan Corp.*,
   1988 U.S. Dist. LEXIS 14956 (N.D. Ill. 1988)................................................ 58

*Whistler Corp. v. Dynascan Corp.*,
  9 U.S.P.Q.2d 2087 (N.D. Ill. 1988) ................................................................................. 59

**STATUTES**

35 U.S.C. § 103(a) ................................................................................................................... 35

35 U.S.C. § 271 ....................................................................................................................... 20

35 U.S.C. § 282 ....................................................................................................................... 30

35 U.S.C. § 283 ....................................................................................................................... 66

**OTHER AUTHORITIES**

35 C.F.R. § 271(a) .................................................................................................................. 62

37 C.F.R. § 1.56(b) ................................................................................................................. 44

Fed. R. Civ. Pro. 9(b) ............................................................................................................. 42

Fed. R. Civ. Pro. 11 ............................................................................................................55, 56

U.S. Const., Art. I § 8 ............................................................................................................. 66

## I.      INTRODUCTION

World Pac International AG ("World Pac AG") and World Pac International USA, Inc. ("World Pac USA") (collectively, "World Pac"), hereby submit their Combined Memorandum of Law in Support of their Motion for Preliminary Injunction ("Motion") against Plaintiff/ Counter-Defendant Viskase Companies, Inc. ("Viskase") for its infringement of World Pac USA's U.S. Patent No. 6,200,613 ("the '613 patent").

In summary, World Pac's Motion for Preliminary Injunction should be granted against Viskase for the following reasons, as set forth in greater detail below:

First, Viskase's accused products clearly copied the pertinent and patented features of World Pac's patented product, and therefore, World Pac has a high likelihood of success of demonstrating infringement, and Viskase has not met its burden of showing any persuasive evidence that World Pac's patent is invalid;

Second, World Pac is being irreparably harmed by Viskase's infringement because much larger Viskase is a direct competitor of World Pac and is directly targeting World Pac's customers, thereby eroding World Pac's market share and threatening World Pac's survival;

Third, the equities and hardships weigh in World Pac's favor because its patented product REDACTED            for this 8-person company, whereas Viskase has numerous other product lines and is a much larger (1300+ person) company; and

Fourth, the public interest is served in granting the preliminary injunction because the Patent Act provides a statutory right to exclude others from making, using, selling, or importing a patented device.  Such a clear statutory right should be protected as matter of public policy.

Moreover, the arguments that Viskase has presented to date, and which World Pac expects to see again in Viskase's substitute memorandum of law, are wholly insufficient to raise

a substantial question of validity of the '613 patent or any material challenge to World Pac's

clear proof of likelihood of success in demonstrating infringement of the '613 patent by the

accused Viskase VISCOAT products.  Likewise, Viskase has made no colorable challenge to the

irreparable harm World Pac is suffering as a result of Viskase's intentional infringement of the

'613 patent, and Viskase merely pays lip service to the other factors that should be weighed and

balanced in deciding the justifiability of a preliminary injunction.

Accordingly, World Pac respectfully requests that a preliminary injunction be issued

barring Viskase from making, using, selling, offering for sale, and/or importing the Viskase

VISCOAT SMOKE MASTER and VISCOAT COLOR MASTER casing products in the United

States and that this Court order the recall of any of the VISCOAT casings that have been

distributed into the market.[1]

## II.   STATEMENT OF FACTS

### A.   World Pac's Invention

Defendant World Pac AG was founded in 1986 with the goal of providing innovative

food packaging to the meat and cheese industry.  *See* World Pac Website, Ex. A.[2]  In 1998, the

---

[1]  Viskase suggested in a prior brief that World Pac's preliminary injunction motion is "weak" because it "did not even offer to post adequate security in the event that an injunction is granted." Ex. A to ECF No. 98 at 3 n.1.  To the contrary, however, nothing in Rule 65(c) requires a party seeking a preliminary injunction to <u>offer</u> to post a bond.  Instead, it requires that the party <u>actually post</u> the bond when the preliminary injunction issues in order to secure it against the possibility that the injunction was wrongfully imposed.  *See e.g., Thermex Co. v. Lawson*, 25 F. Supp. 414 (E.D. Ill. 1938).  Accordingly, World Pac remains ready and willing to post a bond adequate to support the imposition of a preliminary injunction in this case and will do so promptly following the entry of an order imposing an injunction, should the Court decide to enter one.

[2]  For ease of reference, all patents cited herein may be found in the accompanying "Appendix of Patents Cited," all relevant pages of deposition transcripts may be found in the accompanying "Appendix of Depositions Transcripts," and all expert reports cited herein may be found in the accompanying "Appendix of Expert Reports."  All other documents cited herein may be found in the accompanying "Appendix of Documents" and are designated with the corresponding Exhibit number (*e.g.*, "Ex. __") therein.

Technical Director of World Pac AG and Master Butcher Tom Schäfer, along with personal friend and confidant Tomoyoshi Nohmi, invented a unique plastic barrier food casing constructed of a plastic foil that is impermeable to steam and/or gas during customary processing (*i.e.*, stuffing, cooking, processing, and the like) and a fiber-based absorbent inner layer impregnated with a coloring and/or flavoring agent to impart color and/or flavor to a foodstuff enclosed within the casing. *See* Def.'s Resp. to First Rogs., Ex. B, at 3-6; *see also* Schäfer Dep. at 82:1-8. A preferred version of the inventive food casing includes an outer polyethylene layer, which has a high resistance to steam or water, a polyamide or nylon layer that has a high resistance to gas bonded to the outer polyethylene layer, and an absorbent inner layer that is bonded to the nylon layer using an adhesive, such as a second polyethylene layer. *See* '613 patent at col. 2, lines 30-67 and Fig. 1.

At the time of Mr. Schäfer's and Nohmi-san's invention, commercially-available food casings included (1) permeable *fibrous* casings that imparted color and/or flavor to foodstuff, but suffered from weight loss during processing and food safety concerns due to steam and/or gas permeability; (2) polyvinylidene chloride ("PVDC") *coated* fibrous casings that imparted color and/or flavor to the foodstuff, but also suffered weight loss and safety concerns due to steam and/or gas permeability; and (3) impermeable plastic casings that did not impart color and/or flavor to the foodstuff because they did not include an absorbent inner layer. *See* '613 patent at col. 1, lines 18-63; *see also* Grolig Decl., Ex. C at ¶¶ 4-5. The inventive casing provided a unique combination of features enabling the customer to cook the foodstuff in the food casing; effectively impart to, and prevent washout of color and/or flavor to, the foodstuff; prevent weight loss during customary production, storage, and shipping; extend shelf life of the cooked foodstuff by avoiding oxygen exposure; and improve food safety. *See* '613 patent at col. 1, lines

3

18-63; *see also* Koslowski Decl., Ex. D at ¶¶ 4-6; Nicholson Dep. at 74:11-75:3, 249:16-251:19

REDACTED                                                                    Ex. E at

VCI027202); Sherry Dep. at 36:6-37:13, 77:14-80:5.

A patent application directed to the invention was filed in the United States in 1999, which claimed priority to a German patent application directed to the same inventive casing. The U.S. Patent Examiner who examined this application directly considered the above-mentioned commercially available PVDC coated fibrous casings and plastic-only casings, which are described in Viskase's U.S. Patent No. 5,698,279.  *See* U.S. Pat. No. 5,698,279; Nicholson Dep. at 177:4-178:17.  The U.S. Patent Examiner in charge of the application ultimately awarded the inventive food casing with U.S. Patent No. 6,200,613 on March 13, 2001, which was assigned on its face to Sun Products, but has subsequently been assigned to World Pac USA.  *See* Assignment dated 9/30/09, Ex. F.

The patented food casing has been sold in the United States since 1999, initially by Vista International Packaging LLC ("Vista") as a World Pac AG distributor, and since 2002 by World Pac USA, which was formed by World Pac AG to sell and distribute the patented casing to the United States, Mexican and Central American markets.  *See* Shäfer Dep. at 191:5-14; *see also* World Pac Website, Ex. A; Def.'s Resp. to First Rogs, Ex. B at 13-14.  Consumers that had previously used the above-described commercially available casings began switching to World Pac's patented food casing to obtain its unique benefits, and, specifically, large customers began switching to improve food safety.  *See* Sherry Dep. at 78:14-80:5; Strenk Dep. at 87:17-89:21; Koslowski Decl., Ex. D at ¶¶ 3-6.  Today, World Pac USA has a total of eight employees

REDACTED                                                          *See* Vaughn Decl., Ex. G at ¶ 9;

World Pac Organizational Chart, Ex. H at WP0017288.

4

**B.**     **Viskase's Products**

Plaintiff Viskase was founded over eighty years ago to manufacture cellulosic casings. *See* Viskase Website, Ex. I. Since then, Viskase has grown into the largest food casing manufacturer in the United States, and has expanded its operations to include over 1,300 employees worldwide with distribution in North and South America and in Europe. *Id.* Viskase is a publicly-traded company that manufactures a wide array of cellulose, fibrous, and plastic casings. *See* Dun & Bradstreet Business Information Report on Viskase Companies, Inc., Ex. J; Sherry Dep. at 23:16-21, 70:15-21. Viskase is a direct competitor of World Pac in the casing market in the United States. ECF No. 1 at ¶ 11. Viskase has filed for bankruptcy at least twice in its history, once in December 1993, and again in November 2002. *See* Dun & Bradstreet Business Information Report on Viskase Companies, Inc., Ex. J. Following the bankruptcy in 2002, Viskase was forced to downsize and make cutbacks. *See* Nicholson Dep. at 20:21-21:18. The layoffs continued through 2006,                    REDACTED

       *Id.* at 19:8-21:1

REDACTED

World Pac created a niche market for a steam and/or gas impermeable plastic foil food casing with a fiber-based absorbent inner layer that could transfer color and/or flavor to a foodstuff enclosed therein, which Viskase had failed to exploit. *See* Sherry Dep. at 56:11-

REDACTED

---

REDACTED

5

REDACTED

By 2004, Viskase's customers were demanding such a casing, and Viskase was losing market share to the World Pac casing and risked the loss of additional market share on its fibrous and MP fibrous coated casings if such a competitive casing was not supplied. *See* Strenk Dep. at 103:15-106:10; Nicholson Dep. at 249:20-254:13; Sherry Dep. at 35:3-37:13. To respond to World Pac's patented casing, Viskase started several programs to develop a casing that provided the benefits of World Pac's patented food casing, REDACTED

Moreover, the industry was trending away from fibrous casings, including PVDC coated fibrous casings, such as Viskase's MP casings,[4] and toward plastic casings for food safety reasons. *See* Nicholson Dep. at 253:9-254:2; Strenk Dep. at 33:12-23; Sherry Dep. at 78:14-79:4, 79:24-80:6. Viskase's own witnesses admit that the MP casing does not fall into the category of "plastic casings" as termed and perceived in the industry. *See* Nicholson Dep. at 205:20-206:5; Strenk Dep. at 33:12-23.

So, with a noticeable hole in its product line, failure to develop an alternative design and suffering from post-bankruptcy downsizing, REDACTED

---

REDACTED

---

[4] The Viskase EZ SMOKE MP SHIRMATIC or "MP casing" is a PVDC coated fibrous casing. *See* Sherry Dep. at 17:14-20. The MP stands for "moisture proof" (*see* Strenk Dep. at 31:20-23), REDACTED

R
E
D
A
C
T
E
D

resulted in a food casing having a strikingly similar construction to the World Pac patented casing and captured all of the pertinent features of the patented food casing of the '613 patent. The below figure shows the     REDACTED

subsequently renamed the "VISCOAT" food casing,     REDACTED

in direct comparison to the World Pac patented casing, which has a polyethylene outer layer laminated to a polyamide (Nylon) layer and an absorbent fibrous inner

---

[5] *See* Sherry Dep. at 42:7-45:5, 52:4-22, 55:8-56:22, 71:4-73:3, 75:16-77:17; email from Sherry to Merritt and Nicholson and attached spreadsheet, dated 1/5/2005, Ex. O at VCI006114-VCI006119; email from Mann to Sherry and Danko, dated 10/26/2004, Ex. P at VCI017745; email from Ryan to Sherry and attached New Product List, dated 10/27/2004, Ex. Q at VCI026133-VCI026136; Nicholson Dep. at 228:17-229:7, 231:1-234:15; Merritt Dep. at 65:4-21.

layer joined to the polyamide layer using a second polyethylene layer as an adhesive.   REDACTED

'613 patent at col. 2, line 55-col. 3, line 35 and Fig. 1.

REDACTED

World Pac Casing Layers



Absorbent Fibrous Inner Layer

Polyethylene Adhesive Layer

Polyamide (Nylon) Layer

Polyethylene Outer Layer

REDACTED   Viskase introduced the VISCOAT food casing to the food casing industry at the 2005 American Meat Institute's ("AMI") Worldwide Food Expo in Chicago.[8]  Passmore Decl., Ex. W at ¶ 4.  World Pac personnel were alerted to Viskase's promotion of the VISCOAT food casing during the 2005 AMI show and had its attorney send a warning letter to Viskase bringing Viskase's attention to the '613 patent and its

[6]  *See* email from Nicholson to Palacci, dated 10/13/2006, Ex. U at VCI008150   REDACTED

[7]  *See* email from Nicholson to Mogil, dated 9/28/2005, Ex. V at VCI007715   REDACTED
    *see also* Nicholson Dep. at 135:23-136:3.

[8]  *See* email from Nicholson to Mogil, dated 9/28/2005, Ex. V at VCI007715   REDACTED
    *see also* Nicholson Dep. at 135:23-136:3.

potential relation to the VISCOAT food casing. *Id.* at ¶¶ 4-6; letter from Schwarze to Viskase, dated 10/27/2005, Ex. X at WP0017285-87. In response, Viskase removed the promotional literature and VISCOAT food casing shirred sample from display at the 2005 AMI show.[9] *See* Passmore Decl., Ex. W at ¶ 6.

### C.   Viskase's Refusal to Provide Samples

In the following months, World Pac repeatedly requested samples of the VISCOAT food casing from Viskase to conduct an analysis of the casing, but Viskase continuously refused the request alleging that it either did not have a casing sample or would not provide a sample. *See* Schwarze Decl., Ex. AA at ¶¶ 5-6; letter from Bobrowicz to Schwarze, dated 1/9/2006, Ex. BB at WP0006442; letter from Kozak to Schwarze, dated 2/10/2006, Ex. CC at WP0006448

REDACTED

Nicholson Dep. at 279:17-280:7. Viskase's outside counsel vehemently denied that Viskase infringed the '613 patent, which he said World Pac would realize upon seeing the product, but that Viskase did not want to share any information, including a sample.[10] *See* Schwarze Decl., Ex. AA at ¶¶ 5-6. Ultimately, with Viskase refusing to provide a sample of the product, it was decided that the market should be monitored for sales

---

[9] Viskase asserts that it did not remove casings from a refrigerated meat case displaying various cooked meats with place cards showing VISCOAT Smoke Master and Nojax Smoke Master. Photograph from 2005 AMI Show, Ex. Y at VCI001377. However, upon inspection of the photograph, it is clear that none of the cooked meats are actually encased in a VISCOAT casing. Each of the meats has been removed from whatever casing was used during cooking, the meats were chunked (*i.e.*, the ends were cut off), and then overwrapped by a clear pure plastic casing. One cannot tell what casing or process was used to cook and color the meats. It could have been done in a fibrous casing or even in World Pac's casing. In any event, the photograph of the refrigerated meat case is irrelevant because there is not even a VISCOAT casing displayed therein. Photograph of Refrigerated Meat Case at 2005 AMI Show, Ex. Z at VCI001372.

REDACTED

of the VISCOAT casing, with the goal of obtaining a sample for testing.  *See* Def.'s Resp. to

First Rogs., Ex. B at 14-19.

**D.** **Viskase's Reverse Engineering Efforts Continued After Learning of the '613 Patent**

Even after learning of the '613 patent,                    REDACTED

**E.** **Viskase Finally Makes Significant Sales to World Pac's Customer**

REDACTED

REDACTED

In the interim, World Pac had secured the right to supply   REDACTED   restaurants with the inventive food casing for   REDACTED   product, through four distributors, West Liberty, Smithfield Foods, Inc. ("Smithfield"), Clougherty Packaging, LLC ("Farmer John"), and Farmland Foods, Inc. ("Farmland"), which happen to be World Pac's four largest customers by volume. *See* Vaughn Dep. at 98:9-20.   REDACTED

REDACTED

### F.     World Pac's Continued Efforts to Obtain Samples in the Market Were Fruitless and Otherwise Thwarted by Viskase

Other than hearing an unconfirmed rumor that Smithfield may trial a "Viskote" (sic.) casing in July 2007 (as discussed in greater detail *infra*),[11]  World Pac sales personnel did not see or hear about Viskase's VISCOAT casings in the actual market.  World Pac sales personnel are in the research and development kitchens and on the shop floors of their respective customers on a regular basis, yet not one of them saw a Viskase VISCOAT being trialed or used.[12] Throughout the period from October 2005 through June 2009, World Pac personnel had been unable to detect any actual sales by Viskase of the VISCOAT casing in the United States, and had been unable to obtain a sample of the VISCOAT casing in the United States.  *See* Def.'s Resp. to First Rogs., Ex. B at 14-19; Schäfer Dep. at 355:18-22; Vaughn Dep. at 209:21-212:4. This is unsurprising,                            REDACTED

---

[11]  World Pac detected no loss in sales at Smithfield around July, August, and September 2007,
                                    REDACTED

                                    Denny Gilewski asked Smithfield for a sample, but Smithfield did not have one.   Sales Recap, dated 6/25/2007-6/29/3007 and 7/2/2007-7/6/2007, Ex. KK at WP00016759-60; Sales Recap, dated 7/9/2007 - 7/13/2007, Ex. LL at WP0016765-66; Email from Gilewski, dated 7/27/2007, Ex. MM at WP0002380; Email from Gilewski to Mogensen, dated 6/16/2009, Ex. NN at WP0002200-01.

[12]  World Pac sales personnel document each visit with a trip report which is copied to the other World Pac sales personnel and the home office.  Other than a July 2007 trip report and email related thereto, not one mentions a Viskase VISCOAT casing being shown or used at a customer in the United States until June of 2009.

REDACTED

Even when World Pac had heard rumors about the "Viskote" product in mid-2007, no one at World Pac knew or could determine if the rumored casing was the same casing that Larry Passmore had told them about at the 2005 AMI Show, and the materials of construction were left to speculation.  Mogensen Dep. at 76:13-16 ("nobody really had any proof or anything that it was actually a copy"), 89:4-12 ("it was not known what type of material it was"); Hiebing Dep. at 141:23-142:6 ("If we're talking about the Viscoat casing, we were unaware that it was being promoted there [at the 2007 AMI Show]); Email from Gilewski, dated 7/2/2007, Ex. MM at WP0002380 (Referring to the casing product tested at Smithfield in 2007,                REDACTED

                                                                                        ; Sales Recap, dated 6/25-6/29 and 7/2-7/6/2007, Ex. KK at WP00016759-60 (confirming that by June of 2007, World Pac was still trying to obtain a sample of the "Viskote" caramel casing to determine its structure); Email from REDACTED to Gilewski, dated 6/9/2008, Ex. PP at WP0004520-23

                                                REDACTED

                                                *See also*, Time Line, Ex. QQ.

---

[13] A pure polyamide casing like VISFLEX and VISMAX does not include a fibrous inner absorbent layer.

World Pac finally found a VISCOAT food casing sample in Taiwan in or around April

2009. *See* Schäfer Decl., Ex. RR at ¶ 5.  After conducting preliminary testing of that sample and

REDACTED

World Pac immediately informed Viskase, as well as World Pac's own four

largest customers mentioned above, of the potential patent infringement conflict between the

'613 patent and the VISCOAT food casing.  *Id.* at ¶¶ 6-9.  Specifically, World Pac AG sent letters

to certain World Pac USA customers informing them about the '613 patent and its belief that the

VISCOAT casing products fall within the scope of one or more claims of the '613 patent.  *Id.* at

¶ 9.

**G.     Independent Test Results Showed that VISCOAT Casings Infringe the '613
        Patent**

Shortly before Viskase filed the lawsuit,[14] World Pac finally convinced one of its U.S.

customers,  REDACTED  to obtain a sample of the VISCOAT casing, which World Pac received

shortly after the filing of the lawsuit.  *See* Mogensen Dep. at 23:3-24:10.  World Pac sent the

casing out to Packer Engineering Inc. ("Packer") to have such detailed testing performed on the

VISCOAT casing in order to determine its materials of construction and its permeability.  *See*

Vaughn Decl., Ex. G at ¶ 8; Reitman Dep. at 278:6-280:4.  Packer tested and inspected the

VISCOAT sample (Test A[15]) and concluded, based on the materials and testing, that the

VISCOAT product is expected to exhibit high impermeability to steam and oxygen, and includes

a "cellulose" … "fiber structure categorized in one or more of the following categories: woven

---

[14]  Before World Pac was able to obtain a sample of the VISCOAT casing in the U.S. to confirm
infringement, Viskase filed a declaratory judgment action in this Court.  Schäfer Decl., Ex. RR at ¶ 11;
ECF No. 1.

[15]  Test A referred to in the Menna Aff. is the VISCOAT SMOKE MASTER product.  Vaughn Aff., Ex.
SS at ¶ 8.  The difference between the VISCOAT SMOKE MASTER and VISCOAT COLOR MASTER
casings is the flavor and/or color included in the casing.  Schaefer Decl., Ex. RR at ¶ 14.

fibers, fabric, knits, and fleece." Menna Aff., Ex. TT at ¶¶ 5-7 & Exhibit 2. Specifically, based

on the testing of the VISCOAT, the polyethylene and polyamide layers thereof were together

expected to satisfy low water vapor and oxygen permeability requirements of food casing

materials. *Id.*

The testing took several weeks to complete. *Id.* at Exhibit 1. After receiving the results

of the detailed testing of the VISCOAT casing, which confirmed infringement of the '613 patent,

World Pac promptly filed a counterclaim for infringement of the '613 patent and moved for a

preliminary injunction to stop Viskase's erosion of World Pac's sales.[16]  Since that time, World

Pac employee Dan Hiebing has also performed weight loss tests comparing the Viskase

VISCOAT casings, Viskase MP fibrous casing, and the World Pac NPP casing. Supp.

Declaration of Daniel Hiebing ("Supp. Hiebing Decl."), Ex. UU at ¶ 4. The Viskase VISCOAT

and World Pac NPP casings experienced no measurable loss in weight over a period of about six

weeks. Comparatively, the Viskase MP fibrous casings experienced a fairly significant loss of

weight within the first week and show extreme signs of mold growth after about six week of

refrigerated storage, whereas the Viskase VISCOAT and World Pac NPP casings show none.

*Id.*

**H.    Materials of Construction Could not be Determined without Sophisticated
          Analytical Instrumentation and Tests**

It is generally impossible to discern the materials of construction of a casing without

scientific analysis in a laboratory (*i.e.*, it cannot be done by casual observation), particularly for a

plastic and/or multilayer plastic/fibrous casing. Reitman Dep. at 278:6-279:9. At a minimum,

the use of sophisticated machines, such as a Fourier Transform Infrared (FTIR) spectrometer,

---

[16] ECF No. 22, World Pac's original brief in support of motion for preliminary injunction.

*i.e.*, an instrument that relies on highly technical spectroscopy analysis, is required to determine or even to "get a glimpse" of the components of a plastic casing, especially a multilayer plastic casing. *Id.* at 279:10-280:4. When discussing the complex tests that he performed to determine the materials of construction of the VISCOAT casing, Dr. Menna testified that the "total time [of his analysis] was maybe spread out, you know, a little bit, but I think it was maybe a few days" which "expressed in hours" totaled about eight to ten hours, because of all of the various necessary steps such as delamination, FTIR, microscopy, differential scanning calorimetry and the like. Menna Dep. at 65:2-24; *see also*, Merritt Dep. 68:12-21.   REDACTED

I.      **Viskase's Continued and Enhanced Efforts to Sell to World Pac's Customers**

Even in the face of the counterclaim and preliminary injunction motion, Viskase continues its aggressive efforts to usurp business and customers from World Pac with the offer of its infringing VISCOAT food casings, at an even faster pace.   REDACTED

REDACTED

REDACTED

If World Pac continues to lose sales to Viskase                REDACTED

World Pac will no longer be profitable.  *See*

World Pac NPP Projected Loss of Business, Ex. YY.                REDACTED

*Id.*

## III.   ARGUMENT

Notwithstanding Viskase's constant hyper-technical arguments,[19] World Pac has adduced

more than sufficient evidence of infringement to support the entry of a preliminary injunction in

this case.  Any further delay in granting an injunction simply compounds the already present

irreparable harm that World Pac suffers, placing World Pac's ability to continue its business in

serious jeopardy.

### A.   Standard for Preliminary Injunction

A party seeking a preliminary injunction in a patent infringement case must demonstrate:

(1) a reasonable likelihood of success on the merits; (2) irreparable harm in the absence of a

preliminary injunction; (3) balancing the hardships tips favors World Pac's position; and (4) a

---

REDACTED

[19]                REDACTED                 means their VISCOAT
casing is permeable, and that its transfer casings do not impart flavor or color immediately upon stuffing
REDACTED                 Such miniscule weight loss is not how the
industry would understand *measurable* weight loss and is likely attributable to the error tolerance of the
scale.  Additionally, interpreting "when the food barrier casing encloses the foodstuff" to mean
*immediately upon* stuffing is reading the claim term completely out of context.  In a recent letter, Viskase
sensibly dropped its argument that its inner absorbent layer is a collection of individual fibers bonded
together, and not a non-woven fabric.  These terms are discussed in greater detail below.

favorable or neutral impact of the injunction on the public interest. *Abbot Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 807, 815-816 (N.D. Ill. 2007) *aff'd* 544 F.3d 1341 (Fed. Cir. 2008); *see also Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353-54 (Fed. Cir. 2008) (citing the four factor test); *Techtronic Indus. Co., Ltd. et al. v. Chevron Holdings Ltd., et al.*, 395 F. Supp 2d 720, 724-25 & n.1 (N.D. Ill. 2005).

The Supreme Court has instructed that the four factors should be weighed and balanced collectively, not piecemeal. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393-394 (2006). In the instant case, as more fully demonstrated through the evidence produced during expedited discovery, all relevant considerations weigh heavily in favor of granting the preliminary injunction.

## B.     World Pac is Likely to Succeed on the Merits of its Counterclaim

In order for a patentee to demonstrate a likelihood of success on the merits in a preliminary injunction hearing, the patentee must demonstrate that: (1) it will likely prove infringement of one or more claims of the patent-in-suit (*see Ranbaxy Labs. v. Andrx Pharm., Inc.*, 2005 U.S. Dist. LEXIS 27753 at *8 (N.D. Ill. Nov. 10, 2005) (finding that a patentee must demonstrate that its opponent infringes the patent-in-suit, and that its infringement claim "likely will survive the alleged infringer's defenses of patent invalidity and unenforceability")); and (2) that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). The burden to come forward with at least *some* persuasive evidence of invalidity is on the challenger, and only then does the patent holder need to rebut such a challenge to validity of the patent by demonstrating that it has a likelihood of success at defeating such a challenge. *Id.* ("In the context of a preliminary injunction, while 'the burden of proving invalidity is with the party attacking validity,' the party seeking the injunction 'retains

19

the burden of showing a reasonable likelihood that the attack on its patent's validity would fail.'"); *see also Ranbaxy*, 2005 U.S. Dist. LEXIS 27753 at *8.

### 1.   High Likelihood of Success of Proving Infringement

A claim of patent infringement exists when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor" 35 U.S.C. § 271. As demonstrated by Packer's independent review, as described more fully above, the Viskase's VISCOAT Casing products infringe one or more claims of the '613 patent.

More specifically, a patentee can prove a likelihood of infringement by providing evidence that each claim limitation is likely present in the accused product(s). *Abbott Labs. v. Sandoz*, 544 F.3d 1341, 1351 (Fed. Cir. 2008); *Oakley*, 316 F.3d at 1344. Viskase's VISCOAT products clearly meet each and every limitation of at least claims 1, 2, and 8 of the '613 patent.[20] *See* Supp. Exp. Rep. of Todd J. Menna, Ph.D., 5/23/2010 at 7-8, App. E; Supp. Exp. Rep. of Seymour G. Gilbert, Ph.D., 5/23/2010 at §§ 2.1-2.7, at 9-15.[21]

Further, the evidence amply demonstrates,                    REDACTED                    that Viskase has copied the pertinent features of World Pac's patented casings covered by the '613 patent, and as a result the VISCOAT casings include all of the pertinent features of the '613

---

[20]  Viskase has conceded for purposes of the preliminary injunction motion that the VISCOAT casings reads on all of the elements of claim 1 of the '613 patent except for the elements of "steam and/or gas impermeable" and the inner layer being "impregnated with coloring and/or flavoring agents in an amount sufficient to impart color and/or flavor to the foodstuff when the food barrier casing encloses the foodstuff."

[21]  World Pac's experts have provided Supplemental Expert Reports in Support of the Motion for Preliminary Injunction which combine the substance of their respective initial expert reports, supplemental expert reports and, generally, their rebuttal reports required by Viskase providing supplemental Non-Infringement, Unenforceability, and Invalidity Contentions, among other reasons, in order to comport with the Court's request that the documents be unified post-claim construction. The supplemental reports specifically incorporate the Court's actual claim constructions in the Order.

patent.                                          REDACTED



                                                         While Viskase

maintained in late 2005/early 2006 that the VISCOAT casing did not infringe the `613 patent,

Viskase and its present litigation counsel refused to provide World Pac with a sample for World

Pac to satisfy itself of the veracity of Viskase's bald non-infringement claims.[22]  *See* pages 9-10,

12-14, *supra*.                                    REDACTED

---

[22]  World Pac's attorney, William Schwarze, told Viskase in early 2006 that this matter could be resolved
easily if Viskase would just provide a sample, but Viskase and its counsel said no, they would not make it
easy for World Pac.  Schwarze Dep. at 49:9-12 ("I said I understood his position but thought it was
ridiculous concerning that matter could be resolved if they really don't infringe so we'll just have to keep
pursuing it")].

Each of these admissions demonstrates Viskase's clear attempts to copy the World Pac patented casing – notwithstanding World Pac's claims that the copy may be infringing – in an effort to capture World Pac's customers and increase its sales in a "niche" market to which customers were being drawn, out of their perceived need for better food safety.  Indeed, had Viskase not copied the World Pac casing, it would have been unable to sell plastic transfer casings to West Liberty Foods in support of its hard-won contract to provide [REDACTED] with plastic casings that transfer smoke and/or color.[23]

In sum, the evidence introduced to date overwhelmingly supports the conclusion that World Pac has a reasonable likelihood of proving its claims of infringement because the VISCOAT casing reads on each and every element of claims 1, 2, and 8.[24]

### a)      The VISCOAT Casings are Demonstrably "Impermeable"

Viskase argues that the VISCOAT casings are not "steam and/or gas impermeable" because the VISCOAT casings suffer from measurable weight loss.  Exp. Rep. of Reitman at 9-

---

R
E
D
A
C
T
E
D

10.  Viskase also argues, in light of the Court's construction of "steam and/or gas impermeable" as "having a low enough permeability or transmission rate to steam and/or gas to prevent a measurable loss of weight, flavor, and taste during customary production, cooking, and storage" (ECF No. 122 at 11), that World Pac has provided no data to show that the VISCOAT casings suffer no loss in flavor and taste.[25]  World Pac addresses these contentions each in turn.

First, the weight loss test results supplied by Viskase's expert, Dr. Reitman, upon which Viskase relies are highly suspect.                    REDACTED

and conclusorily stated that one of ordinary skill in the art would use such a scale to measure weight loss of a food product.  Exp. Rep. of Reitman at 10.  Dr. Reitman made this statement while conceding that she had no first-hand knowledge of procedures at the customer facilities where the casings are actually stuffed, cooked, and stored.  Reitman Dep. at 104:6-15, 104:24-106:2.  Mr. Daniel Hiebing, who has over thirty (30) years of experience in the meat packaging industry, indicates that weights are customarily taken to two decimal points in pounds in this industry.[27]  Since Dr. Reitman's greatest recorded apparent weight loss        REDACTED

no weight loss may have been recorded if Dr. Reitman utilized the customary scale for the industry.[28]

---

[25] Flavor is generally speaking a distinctive taste of something as it is experienced in the mouth such as smoke flavor.  So, flavor and taste would be tested using similar parameters.

[26] It appears that Dr. Reitman made this choice because Mr. Schäfer testified that he used a scale that reads in grams with a tenth of a gram precision for his testing during development in Karlsruhe, Germany.  Schäfer Dep. at 126:6-13.  However, in the United States market, customers and those skilled in the art of processed meat production use scales that read in pounds with hundredths of a pound precision.  Supp. Hiebing Decl., Ex. UU at ¶¶ 7-9.  So, to determine no measurable loss in weight, the units commonly used as a practical matter in this industry in the United States are pounds.

[27] Supp. Hiebing Decl., Ex. UU at ¶ 8.

[28] Supp. Exp. Rep. of Gilbert at 11.

Dr. Reitman further testified that she did not bother to find out the percent error or error

tolerance of the scale she used to conduct the weight loss testing. *Id.* at 225:24-226:7. Percent

error is multiplied by the maximum scale value to obtain the tolerance for weight measurements.

REDACTED

If the scale had even a 0.1% error,                    REDACTED


All of the weight loss amounts would fall within the tolerance of the scale and could be

accounted for simply by the margin of error.                    REDACTED



Regarding the requirement in the construction of "steam and/or gas impermeable" of

having no measurable loss of flavor and taste, because World Pac was unaware of this being a

conjunctive requirement in addition to no measurable loss in weight prior to the issuance of the

claim construction order, testing for loss of flavor and taste in the VISCOAT products has not

yet been obtained.  However, it is possible to infer from the presently available data that the

VISCOAT casings do not suffer from measurable loss of flavor and taste for purposes of the

preliminary injunction.[30]  The test for loss of flavor and taste after cooking is <u>to compare with a</u>

---

REDACTED

[30] At the preliminary injunction stage, World Pac need only demonstrate a reasonable likelihood of
success in proving infringement.  Identifying losses in "taste" and "flavor" by comparing products before
and after processing can be established by objective criteria such as a taste panel or gas chromatograph.
But, Viskase's ongoing sales of the VISCOAT COLOR MASTER for the          REDACTED
                              demonstrates that the food products cooked in the VISCOAT casing, like those in
the World Pac NPP SUN CARAMEL casings, do not suffer from a loss in taste and flavor, REDACTED

24

customer standard (*i.e.*, the desired flavor and taste).[31]  See Supp. Hiebing Decl., Ex. UU.  If the

customer has a standard for a mesquite smoked turkey, then after cooking it should have the

particular standard mesquite smoked turkey taste and after storage, it should still have the

particular standard mesquite smoked turkey taste. *Id.*  Likewise, if the customer has a standard

for a fresh cooked ham taste, then after cooking it should have a fresh cooked ham taste and after

storage, it should still have a fresh cooked ham taste. *Id.*

     For example, to qualify            REDACTED            requires

compliance with a strict battery of taste requirements, and must be able to have    REDACTED




           Viskase would not have qualified to supply VISCOAT casings for

REDACTED had the VISCOAT casings suffered from measurable loss of flavor and taste.  Further,

Dr. Gilbert has determined that, due to the excellent oxygen barrier properties of the combined

polyethylene and polyamide (nylon) materials of the VISCOAT casing, the polyethylene and

nylon layers thereof would not permit a measurable loss of flavor and taste during customary

production, cooking, and storage. *See* Supp. Exp. Rep. of Gilbert at  11, 12.

     Even if the Court found the weight loss data presented by Viskase or the present lack of

actual test data for loss of flavor and taste to be sufficient to avoid literal infringement, the

VISCOAT casings still read on "steam and/or gas impermeable" under the doctrine of

---

[31]  As the Court has explained, the flavor and taste called for is based at least partially upon "the desired
color and/or flavor effect [that] is produced in the foodstuff" (in combination with the foodstuff itself).
See ECF No. 122 at 19-23.

equivalents.[32] Infringement under the doctrine of equivalents may be proven by demonstrating that "a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result." *Ethicon Endo-Surgery v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

The function of the steam and/or gas impermeable foil in claim 1 is to provide a barrier to oxygen and steam over a period of intended use, (*i.e.*, cooking, shipping, and storage). *See e.g.*, ECF No. 70-4 at col. 1, lines 39-43; col. 2, lines 55-62. This function is accomplished by using one or more films of material that are individually or collectively resistant to steam and/or gas. *See e.g.*, *id.* at col. 2, lines 55-62; col. 3, lines 23-32. The result is that over the period of intended use, there is no loss in weight, taste, and flavor. *See e.g.*, *id.* at col. 2, lines 13-19 and lines 65-67; col. 4, lines 25-36. World Pac's experts have considered the weight loss testing performed by Dr. Reitman[33] and by World Pac's employee, Dan Hiebing, and have applied a

---

[32] Viskase has complained that the doctrine of equivalents was raised "for the first time" in World Pac's May 14 filing. This is completely contrary to fact. World Pac's counterclaim for infringement specifically pled infringement either "literally or under the doctrine of equivalents." ECF No. 11 at ¶ 68. Both of World Pac's opening expert reports also included doctrine of equivalents analyses. Exp. Rep. of Menna at ¶¶ 25 and 27; Exp. Rep. of Gilbert at pg. 11. Viskase was therefore well aware during the depositions of Drs. Menna and Gilbert that the doctrine of equivalents had been raised, and had every opportunity to depose the experts regarding the issue, but instead chose not to do so. Viskase now argues that a detailed function-way-result test had not previously been set forth. However, World Pac was not in possession of test results showing weight loss by the VISCOAT casing until Dr. Reitman's report filed on April 30, 2010. Until this time, all of the test results had indicated *literal* infringement under World Pac's construction of "steam and/or gas impermeable." World Pac does not agree that Dr. Reitman's tests were performed in a manner consistent with the industry custom or that the negligible losses shown are outside of the error tolerance for the scale she utilized. But, even if, *arguendo*, the 3-4 grams of loss Dr. Reitman says constitutes a measurable loss of weight, then the VISCOAT casing still infringes under the doctrine of equivalents.

[33] The first time World Pac learned of Dr. Reitman's weight loss testing performed in March 2010 was when her expert declaration was attached to Viskase's original (pre-claim construction) opposition brief filed and served on April 30, 2010. See ECF No. 89-1. Viskase also complains that World Pac's experts surprised it with rebuttal reports in response to Dr. Reitman's expert report. However, World Pac advised Viskase during discovery that it would provide a rebuttal to whatever expert report Viskase submitted. Moreover, both the Federal Rules of Civil Procedure Rule 26 and Local Patent Rule 5.1 contemplate

26

doctrine of equivalents analysis in their respective Expert Rebuttal Reports and their

Supplemental Expert Reports.  Rebuttal and Supp. Exp. Rep. of Menna; Rebuttal and Supp. Exp.

Rep. of Gilbert.

　　　　Specifically, the polyethylene and nylon layers of the VISCOAT casings perform

substantially the same (if not identical) function as the "steam and/or gas impermeable plastic

foil" in the '613 patent.  Namely, the polyethylene and nylon layers together provide a "barrier to

oxygen and moisture," which "enables the cook and ship" of the product.  Reitman Dep. at

75:22-76:12.  These layers also perform this function in substantially the same (if not an

identical) way, that is, the polyethylene is a better barrier to moisture than nylon, and the nylon is

a better barrier to oxygen than the polyethylene, and together one achieves the total set of

properties.  *Id.* at 76:18-78:9.  The polyethylene and nylon layers of the VISCOAT casing

accordingly achieve substantially the same result.　　　　　　　REDACTED

　　　　　　　　　　　　　　　　　　　　　　　　　Such small percentages of weight

loss are insignificant, particularly when, as Dr. Reitman testified, the actual products in the

market would weigh closer to 37 pounds,　　　　　　　REDACTED

　　　　　　　　　　　　　　Exp. Rep. of Reitman at 10.  Further, as described above, in order to

meet the rigorous requirements of[REDACTED] as to taste and flavor, and given the excellent oxygen

barrier properties of the VISCOAT casing outer layers, any loss in taste and flavor by the

---

rebuttal reports.  Dr. Reitman raised new testing, prior art, and arguments not previously raised by
Viskase in its initial contentions.

VISCOAT casing would necessarily be insignificant.          REDACTED

> Supp. Exp. Rep. of Gilbert at 11, 12.  Accordingly, the

VISCOAT casings achieve substantially the same result – substantially no loss in weight, taste,

and flavor.

World Pac thus clearly demonstrates that even if the VISCOAT casings are found to not

literally include a "steam and/or gas impermeable plastic foil," the weight loss experienced by

the VISCOAT products is *so insignificant* that the polyethylene and nylon layers of the

VISCOAT casing clearly meet this claim element under the doctrine of equivalents.

> **b)**     **Viskase's VISCOAT Casings are Necessarily Impregnated
> with a Sufficient Amount of Coloring and/or Flavoring Agents**

Viskase also asserts that the VISCOAT products are not impregnated with a coloring

and/or flavoring agent in an amount sufficient to impart color and/or flavor to the foodstuff when

the foodstuff is enclosed in the casing.  Aside from the fact that Viskase has absolutely no expert

testimony that establishes that the VISCOAT casings do not meet this element of the claim, its

argument is refuted by its own product literature.  The VISCOAT brochure recites that the

"SMOKE MASTER" casings are "treated with natural liquid smoke *that will transfer smoke*

*flavor and color to the surface of the product,*" and that the casings are available "in low to

strong smoke flavor as well as light to dark transfer colors."  VISCOAT brochure, Ex. BBB..

The brochure similarly touts the "COLOR MASTER" casing as having the ability to impart

caramel color to the product in a range from "golden to dark brown."  *Id.*

The VISCOAT casings therefore must be impregnated with a sufficient amount of

coloring and/or flavoring agent, or the casings would never live up to customer expectations

based on the Viskase brochure.  Indeed, REDACTED includes strict requirements for color and flavor

integrity and stability for          REDACTED          products, for which the VISCOAT casings

would never have qualified if the casings were unable to retain the sufficient amount of coloring

and/or flavoring agent.                           REDACTED


Viskase's argument here is non-sensical.  Viskase witnesses have testified that the

purpose of the inner layer of the VISCOAT casings is to retain and transfer color and/or flavor to

the foodstuff when the foodstuff is enclosed therein (*i.e.*, between the time the foodstuff is placed

into the casing and the time the casing is peeled off). *See* Merritt Dep. at 101:22-102:13

(agreeing that the VISCOAT casings are "treated with liquid smoke in some instances to impart

smoke color and flavor to processed meats" and that during and prior to "cooking the smoke,

color and flavor transfers to the processed meat providing a rich brown color and a variety of

smoke flavors"); Nicholson Dep. at 70:13-17; 71:1-22 (the purpose of the absorbent inner layer

is to "transfer smoke, flavoring or caramel" to the customers food products during processing).

Further, Viskase's expert testified that when given a reference color, for example, Viskase would

be able to match the color, which would be impossible if the VISCOAT casing was not

impregnated with a sufficient amount of colorant.  Reitman Dep. at 200:6-22.

Accordingly, as World Pac has shown (Exp. Rep. of Menna at Ex. E, at 10-12; Supp.

Exp. Rep. of Gilbert at § 2.4), it is clear that the VISCOAT casings meet the element of being

impregnated with a coloring and/or flavoring agent in an amount sufficient to impart color and/or

flavor to the foodstuff when the foodstuff is enclosed in the casing, despite the strained

protestations of Viskase.

### 2.   High Likelihood of Success Demonstrating Validity in View of Viskase's Insufficient Challenge

Once issued by the USPTO, a United States patent is presumed valid and in compliance

with the requirements for patentability. 35 U.S.C. § 282.  One attacking the validity of a patent

claim must present clear and convincing evidence establishing facts which lead to the legal conclusion that the patent claim is invalid. *Am. Hoist & Derrick v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359, 220 U.S.P.Q. 763, 770 (Fed. Cir. 1984). A challenger must also overcome the deference due to the Examiner when challenging the validity of a patent based on a reference that was before the Examiner during prosecution of the patent. *Id.*

At the preliminary injunction stage, the challenger need only show a "substantial question" exists as to validity. *Oakley, Inc. v. Sunglasses Hut Int'l*, 316 F.3d 1331, 1340 (Fed. Cir. 2003). While the "substantial question" standard is less stringent than the clear and convincing standard that would be applied at trial, the Court still should take note of the fact that once a patent issues, it is presumed valid and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282; *Oakley, Inc.*, 316 F.3d at 1339 (Fed. Cir. 2003). This remains a fairly heavy burden to meet and, therefore, in a response to a motion for a preliminary injunction, the opposing party "must identify at least some persuasive evidence of invalidity at this early stage to overcome the presumption of validity." *Ranbaxy*, 2005 U.S. Dist. LEXIS 27753 at *8. Thus, the court must presume validity of the movant's patent unless the opposing party has demonstrated invalidity to an extent where it might be possible to demonstrate such invalidity with clear and convincing evidence later at trial. *Id.*; *see also Genentech, Inc. v Novo Nordisk A/S*, 108 F.3d 1361, 1364 n.2 (Fed. Cir. 1997).

In addition, the fact that                    REDACTED

further supports the presumption that World Pac's patent is valid. *Stuart W. Johnson & Co. v. Ro-Ber, Inc.*, 1967 U.S. Dist. LEXIS 8000 at *16 (N.D. Ill. 1967) ("[l]imitation

by a competitor is not only the sincerest form of flattery but a touchstone of invention as well, and greatly strengthens the presumption of validity").

In this case, while Viskase has now proffered several arguments in support of its superficial claims of invalidity, each of its arguments fail when examined closely.

**a)**      **Viskase's Anticipation Argument Fails Because None of the References Cited Discloses Each and Every Element of the Claims**

In order to show anticipation of a claim, a proponent is required to demonstrate that a single reference discloses each and every element of the claim, and the elements must be "'arranged as in the claim.'" *See Net MoneyIN, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008) (*quoting Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)); *see also Pressure Products Med. Supplies, Inc. v. Greatbatch Ltd.*, No. 2008-1602, 2010 U.S. App. LEXIS 6132 at *19-20 (Fed. Cir. Mar. 24, 2010) (quoting *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003)).  A reference may not be treated as a "'mere catalog[ ] of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning.'"  *Id.* at 1370 (*quoting Lindemann Maschinefabrik GmbH v. Am. Hoist & Derrick Co.*, 730 F.2d 1452 (Fed. Cir. 1984)).  It is well settled that in order to anticipate a claim, the elements of the prior art reference must be arranged as required by the claim.  *In re Bond*, 910 F.2d 831, 15 USPQ2d 1566 (Fed. Cir. 1990).  MPEP 2131.

Viskase has cited a number of references as anticipating claims 1, 2, and 8 of the '613 patent.  *See* Viskase's Contentions, Ex. CCC at 6-14; Viskase's Supp. Contentions, Ex. DDD at 3-6; Exp. Rep. of Reitman at Exhibit E.  However, at least one element of claim 1 is missing from each reference cited and/or the elements are not arranged as claimed.  *See* Supp. Exp. Rep. of Gilbert at §§. 4-5.1.d, at 18-28; Def.'s Init. Resp. to Invalidity Contentions, Ex. EEE at 2-12.

Moreover, Viskase's expert clearly does not understand how to conduct a proper anticipation analysis. In the anticipation law section of her report, Dr. Reitman recites only that each element must be present in a reference in order for anticipation to exist, and neglects the requirement that the disclosed elements must be *arranged as in the claim*. Exp. Rep. of Reitman at 12. Dr. Reitman confirmed this misunderstanding during her deposition.[34]  Reitman Dep. at 51:2-56:4. Viskase's improper anticipation analysis is insufficient to support a finding of invalidity.

Viskase also relies heavily on one particular set of references as anticipating, namely plastic or "PVDC" coated fibrous casings, such as Viskase's own MP fibrous casing,[35] or U.S. Pat. Nos. 4,377,187 ("Chiu") and 4,756,914 ("Jon '914"). *See e.g.*, Exp. Rep. of Reitman at 15-16. Viskase maintains these positions in spite of the Court's construction of "plastic foil," which reads "a self-supporting film or sheet of plastic." ECF No. 122 at 14. Aside from the fact that coatings were disclaimed during prosecution (*see* pages 48-49, *infra*), plastic *coatings* are *not* self-supporting. Although Dr. Reitman was able to delicately peel a small section of PVDC off of an MP casing (Exp. Rep. of Reitman at 23), Viskase's own vice-president of New Products

---

[34] Q: So you do understand that you have to have the -- each element plus how the elements are arranged in the claim, correct?

A. Each element.  What do you mean by arrangement?  I mean each element needs to be there.

[35] In keeping with the practice of misunderstanding the concept of prior art, Dr. Reitman concedes that she does not have any product sample or document to rely upon in demonstrating that the MP casing in 1998 included all of the features of the claims of the '613 patent, but instead relies only upon the word of Viskase employees that the MP casing sold today is the same product sold twelve years ago.  Reitman Dep. at 43:20-44:14, 46:4-47:8.  The only evidence produced by Viskase for the EZ Smoke MP Shirmatic casing is a sales brochure that is not even an enabling reference because it does not provide the materials of construction for the casing.  EZ Smoke MP Shirmatic Casings Product Data, Ex. FFF ("EZ Smoke MP Shirmatic fibrous casings are treated with liquid smoke and a moisture proof coating..."). Accordingly, the anecdotal EZ Smoke MP Shirmatic fibrous casings fail as prior art for both anticipation and obviousness.

and Technologies admits that without the fibrous layer as a "mechanical base," the PVDC coat would not be self-supporting to handle normal operations.  Nicholson Dep. at 206:14-207:17.

Dr. Reitman also contradicts her own analyses by relying on plastic-coated casings.  Dr. Reitman argues that the VISCOAT products are not "impermeable" based on the Court's construction because she was "able to measure a loss of weight."  Exp. Rep. of Reitman at 9-10. At the same time, Dr. Reitman characterizes plastic-coated casings as being impermeable under this same construction.  *Id.* at 22.  However, Dr. Reitman admitted that her weight loss tests also included samples of the Viskase MP fibrous casing, and that                 REDACTED

                REDACTED     Reitman Dep. at 263:15-264:2.  Based on Dr. Reitman's analysis on the one hand, measured weight loss by the VISCOAT casings indicates that the VISCOAT outer layer is permeable, but on the other hand,             REDACTED             does not remove the plastic coating from the realm of impermeable, according to the Court's construction.  These positions are clearly inconsistent.

World Pac has conducted its own weight loss tests on the VISCOAT and MP fibrous casings, and have concluded that the MP fibrous casing is permeable, as evidenced by weight loss data (over 8% loss) and the growth of mold on the enclosed foodstuff after about six weeks in storage, as opposed to no measured loss of weight with the VISCOAT casings, which also exhibited a total lack of mold growth after the same amount of time.  *See* Hiebing Supp. Decl., Ex. UU.



In light of the Court's construction of plastic foil, as well as the inconsistencies in

Viskase's analysis, the references related to plastic-coated fibrous casings should be disregarded.

**b) Viskase Has Failed to Meet its Burden to Demonstrate Obviousness as a Matter of Law**

In addition, Viskase relies on a cursory allegation that the '613 patent is invalid for obviousness, which is insufficient as a matter of law. 35 U.S.C. § 103(a). Such insufficient and vague allegations waste the litigants' and the Court's time and resources. Specifically, Viskase has failed to adequately articulate any specific reasoning with a rational underpinning for combining any of the cited references or for making proposed modifications to the cited references.

"A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art," but "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)) (internal quotations omitted). *KSR* specifically requires a determination that "there was an *apparent reason* to combine the known elements in the fashion claimed by the patent at issue." *Id.* (emphasis added). The Federal Circuit has emphasized this step in performing an obviousness analysis. *See, e.g., Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) ("the [Supreme] Court acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.'") (quoting *KSR*).

District courts have also followed this requirement in the years since the *KSR* decision. *See e.g., Dow Jones & Co., Inc. v. Ablaise Ltd.*, 632 F. Supp.2d 23, 33 (D.D.C. 2009) (explaining that "at minimum, Dow Jones must show…that a person of ordinary skill in the art would have an 'apparent reason to combine the known elements in the fashion claimed by the patent at

35

issue'") (quoting *KSR*); *Medtronic, Inc. v. AGA Med. Corp.*, 2009 U.S. Dist. LEXIS 36171, *12

(N.D. Cal. April 28, 2009) (stating that although a party seeking to demonstrate obviousness is

no longer required to satisfy the teaching, suggestion, motivation test, "such party nevertheless

must show there was 'an apparent reason to combine the known elements in the fashion claimed

by the patent at issue'") (quoting *KSR*); *Perricone v. Medicis Pharm. Corp.*, 539 F. Supp.2d 571,

584 (D. Conn. 2008) ("The party seeking to invalidate a patent is also required to articulate an

'apparent reason' for altering the prior art to achieve the claimed invention").

   The USPTO has similarly followed *KSR*'s requirements. *See, e.g., Ex parte Whalen*,

2008 Pat. App. LEXIS 25, *21-22 (B.P.A.I. July 23, 2008) (finding that the Examiner had not

provided an adequate apparent reason to make the proposed modification obvious). Thus, under

a proper reading of *KSR*, "a judge must not pick and choose isolated elements from the prior art

and combine them so as to yield the invention in question if such a combination would not have

been obvious at the time of the invention." *Abbott Labs.*, 544 F.3d at 1348 (emphasis added).

   Neither Viskase nor its expert have stated any way or reason for specifically combining

any of the cited references together to render the claims of the '613 patent obvious. Dr.

Reitman's report merely recites that all of the elements were known and that therefore it would

have been obvious for one of ordinary skill in the art to combine them. Exp. Rep. of Reitman at

19. Dr. Reitman's testimony further illustrated that she was relying merely on the existence of

certain elements of the claims of the '613 patent as being in the prior art, and one of ordinary

skill in the art broadly would know how to put the elements together. Reitman Dep. at 206:12-

212:13. Dr. Reitman summarily explained that the required modifications to the references are

generally "simple substitutions," but never explained in her report how one of ordinary skill in

the art would make such substitutions.[36] *Id.* Her analysis is incomplete, and therefore, Viskase has not met its burden.

Indeed, Viskase essentially left it up to the Court to pick among a wish list of references, and decide which to combine and how to combine them, rather than explicitly providing a specific combination of references with an articulated apparent reason to combine this specific set, which is clearly improper. *See KSR*, 550 U.S. at 418 (2007) ("A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art"); *see also Hearing Components, Inc. v. Shure, Inc.*, 2009 U.S. Dist. LEXIS 17168, *13-14 (E.D. Tex. Mar. 6, 2009)[37]; *Panduit Corp. v. Band-It-Idex, Inc.*, 2000 U.S. Dist. LEXIS 11111 at *63-66 (N.D. Ill. June 23, 2000).

Moreover, it is completely inappropriate to evaluate the invention using 20/20 hindsight to determine whether a patent is invalid due to obviousness. Specifically, "[m]easuring a claimed invention against the standard established by section 103 requires the difficult but critical step of casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field." *In Re Dembiczak, 175 F.3d 994, 998-999 (Fed. Cir. 1999), abrogated on other grounds* (quoted with approval by *Panduit*, 2000 U.S. Dist. LEXIS 11111 at *63-65). "The fact

---

[36] Dr. Reitman purports to know how one of ordinary skill in the art of food packaging would understand the references and how to put the references together. However, Dr. Reitman's CV and testimony show that she lacks any practical or design experience in the food casing industry, as she relies solely on her experience as a consultant on behalf of Exponent. Reitman Dep. at 275:18-277:17. Dr. Reitman further concedes that she never visited any customers in the field, and has no personal knowledge of how these casings are used in the meat and cheese industry. *Id.* at 104:6-15, 104:29-106:2.

[37] "To permit a party to list, for example, nine prior art references, and allow an expert to tell the jury that some combination of two or more of them is what makes a claim invalid is gamesmanship of the highest order...Some of [the combinations] may actually invalidate a claim, but is it clear and convincing evidence to the jury if that combination was not explained to them?" *Hearing Components*, 2009 U.S. Dist. LEXIS 17168 at *13-14.

that something may seem obvious with the benefit of 20/20 hindsight does not address the key

question: whether the invention was obvious when the patent was sought." *Id.* at *65.

Dr. Reitman asserted that she is not relying on the '613 patent for a motivation or

apparent reason to combine references (Reitman Dep. at 205:1-19), but the entire first paragraph

of her scant "Combination of the Prior Art References" section is dedicated to the '613 patent

and she fails completely to explain how or why one of ordinary skill in the art would combine

these references.[38] *See Proctor & Gamble v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed.

Cir. 2009) ("a party seeking to invalidate a patent based on obviousness must demonstrate…that

a skilled artisan would have been motivated to combine the teachings…to achieve the claimed

invention, and that the skilled artisan would have had a reasonable expectation of success in

doing so").  To the extent Viskase is intimating that the motivation or reason to combine

references can be found in the patent-in-suit itself, this should be rejected outright.

### c)   Viskase Similarly Ignores the Overwhelming Secondary Considerations that Refute its Claim of Obviousness

Even if the Court were to conclude that Viskase had stated a *prima facie* case of

obviousness, an evaluation still must be made as to whether secondary considerations exist that

refute a claim of obviousness of the invention.  *KSR*, 550 U.S. at 406 (quoting *Graham v. John*

*Deere Co. of Kansas City*, 383 U.S. 1 (1966)).  Put another way, it is well-settled that "evidence

of secondary considerations must have been considered prior to reaching a conclusion on

obviousness/nonobviousness." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d

---

[38]  In its Supplemental Contentions, Viskase similarly stated that a reason to combine the references can be found in the '613 patent itself.  This, again, is a complete misunderstanding of the law on obviousness and is an improper reason to combine because it "smacks of impermissible hindsight construction" (*Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000)) and should be rejected.

1387, 1391 (Fed. Cir. 1988) (quoting *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776

F.2d 281, 306 (Fed. Cir. 1985)).

Secondary considerations alone can demonstrate nonobviousness. *Pressure Prods.*, 2010

U.S. App. LEXIS 6132 at *20-21 ("This court has repeatedly explained that secondary

consideration evidence is not just a cumulative or confirmatory part of the obviousness calculus,

but constitutes independent evidence of nonobviousness."); *see also Demaco*, 851 F.2d at 1391

("The rationale for giving weight to the so-called 'secondary considerations' is that they provide

objective evidence of how the patented device is viewed in the marketplace, by those directly

interested in the product."). Examples of secondary considerations include "commercial success,

long-felt but unsolved needs, failure of others, and the presence of a motivation to combine, or

avoid combining, prior art teachings." *Power-One, Inc. v Artesyn Techn., Inc.*, 2010 U.S. App.

LEXIS 6487, *15 (Fed. Cir. Mar. 30, 2010) (citing *KSR*, 550 U.S. at 406, 415-18).

Despite this mandatory analysis, Viskase has completely ignored the substantial record

evidence of secondary considerations, including the evidence that World Pac identified in its

response to Viskase's First Set of Interrogatories.[39] Def.'s Resp. to 1st Rogs, Ex. B at 9-12.

Specifically, World Pac explained that secondary considerations supporting a conclusion of

nononbviousness "may include such factors as: evidence of commercial success of the invention,

long-felt but unsolved needs, failure of others, praise by others, copying by others and

unexpected results." *Id.* at 9. World Pac has identified numerous secondary considerations that

exist in this case to support that the '613 patent is not obvious as follows:

> Commercial success: World Pac's casings covered by the '613 patent have been
> a huge commercial success, as demonstrated in the sales figures. Customers have

---

[39] As discussed later in this brief, Viskase's witnesses and former employees completely confirm the extent of the strength of such secondary considerations.

specified the World Pac's casings covered by the '613 patent because of the patented features of the casings. For example, an impermeable casing with an inner absorption layer that is capable of imparting color and/or flavor is a key market differentiator of World Pac's casings.

Long-felt, but Unresolved Needs: World Pac's casings, covered by the '613 patent, addressed a long-felt, but unmet need relating to impermeable casings for foodstuff that had existed on a global scale until World Pac's casings were introduced into the market in 2001. Until this point, food manufacturers were utilizing fibrous casings which resulted in loss in weight, taste and flavor during the production stages, cooling and storage of the cooked product, as well as food products having a relatively short shelf-life. Food manufacturers were thus required to cover the food products with an additional barrier casing, thus increasing production costs and expenses.

. . . Once World Pac's casings were introduced into the market, however, food manufacturers switched from their previous casings to World Pac's casings covered by the '613 patent, to benefit from the patented features of World Pac's casings. Specifically, REDACTED switched from fibrous casings to World Pac's casings covered by the '613 patent to increase yield and shelf-life of their products. REDACTED switched from Cry-O-Vac's extruded plastic casing (described below) to one of World Pac's casings covered by the '613 patent, and continues to this day to use World Pac's casings. Notably, once Cry-O-Vac decided to discontinue its extruded plastic casings due to poor performance, it recommended World Pac's casings to REDACTED also switched to one of World Pac's casing covered by the '613 patent from the Cry-O-Vac casing. That World Pac addressed a long-felt, but unmet need in the global industry is further evidenced by the fact that a competitor of World Pac, Kalle, sought a license for a counterpart European patent…

Failure of others: Others, such as Viskase, have failed in attempts to make a "barrier casing" that imparts color and/or flavor. For example, fibrous casings coated with PVDC suffered from edge cracking resulting in non-barrier properties, weight loss and attack by oxygen. For example, Cry-O-Vac had developed an extruded plastic casing that purportedly transferred smoke and/or color to the product, but eventually discontinued the casing because it did not consistently perform to transfer smoke and/or color. Vector has similarly tried to develop a smoke or color coated impermeable casing, but users have found the cooking process with the Vector casings to be tedious and produce inconsistent results. When World Pac was first trial testing World Pac's casings covered by the '613 patent, its customers commented that many others have said that they had a barrier casing with flavor and/or smoke, only to have the purported casings fail.

Praise by others: Others, including the DLG (Deutsche Landwirtschafts-Gesellschaft) German Agricultural Society and the journals European Dairy Magazine, Deutsche Milchwirtschaft, Fleischwirtschaft, Fleischwirtschaft International and Lebensmitteltechnik, awarded World Pac International AG the European FoodTec Gold Medal Award in 2006 for its casings covered by the '613 patent, which were considered a milestone innovation. The Gold Medal was awarded to World Pac International AG for

the successful implementation of the innovative and forward-looking casing covered by the '613 patent.

Further, several of World Pac's customers, including meat and cheese manufacturers in particular, have praised the functioning qualities of World Pac's casings covered by the '613 patent as being the only casings that withstand production demands and deliver consistent color and flavor transfer to finished products. Further, World Pac's customers have found that the casings covered by the '613 provide significant benefits from a food safety aspect, as they provide an impermeable barrier casing which protects foodstuff while in transit from a production facility to a slicing facility at a different geographic location.

Copying by others: Viskase has copied the pertinent claimed features of the '613 patent. Further, Viskase's copying activities were not and could not be construed as inadvertent. Instead, Viskase deliberately copied the pertinent patented feature of World Pac's casings covered by the '613 patent after observing the commercial success of the casings.

Unexpected results: One of ordinary skill in the art would not have been motivated at the time of the invention of the '613 patent to impregnate such a thin inner layer with color and/or flavoring agents. The inventors, on the other hand, surprisingly discovered that the thin wall thickness of the inner layer of the invention of the '613 patent was sufficient to absorb the color and/or flavoring agents. This result was completely unexpected and could not have been foreseen by one skilled in the art at the time of the invention. . . .

*Id.* at 9-12; *see also* pages 2-18, *supra*.

REDACTED

Similarly, Viskase's contemporaneous reaction to the invention of the casing by

attempting to create                                REDACTED

                          casing further demonstrates secondary considerations that

undermine Viskase's obviousness argument. *See Power-One*, 2010 U.S. App. LEXIS 6487 at

*18; pages 5-9, 10, *supra* (citing Viskase's own testimony).                    REDACTED

In other words, sufficient secondary considerations exist to demonstrate that the '613

patent is valid, nonobvious and enforceable.  Because "rejections on obviousness grounds cannot

be sustained by mere conclusory statements,"[40] and because there is ample evidence in the record

to demonstrate relevant secondary considerations, this Court should disregard Viskase's

conclusory arguments that the '613 patent is invalid as obvious.

### 3.    Viskase's Argument that the '613 Patent is Unenforceable Due to Inequitable Conduct is Misplaced and Untimely

Viskase has argued that the '613 patent is unenforceable due to the inequitable conduct of

the inventor and the prosecuting attorney.[41]  At the outset, however, "inequitable conduct, while a

broader concept than fraud, must be ***pled*** with particularity."  *See Ferguson Beauregard/Logic*

*Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003)

(emphasis added).  "A pleading that simply avers the substantive elements of inequitable

conduct, without setting forth the particularized factual bases for the allegation, does not satisfy

Rule 9(b)."  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326-27 (Fed. Cir. 2008).

Rather, a pleading is required to "identify the specific who, what, when, where, and how of the

material misrepresentation or omission" and "sufficient allegations of underlying facts from

---

[40]  *KSR*, 550 U.S. at 418 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

[41]  Ex. A. to ECF No. 98 at 26-29.

which a court may reasonably infer" a specific intent to deceive the Patent Office. *Id.* at 1328-29.

Viskase did not originally plead a claim or defense of inequitable conduct at all in either its Complaint or its Reply to World Pac's Counterclaim (*see* ECF Nos. 1 and 42).  Viskase now seeks to amend its pleadings to include its allegations of inequitable conduct, despite the unavoidable fact that all of the alleged bases of its claim have been known to it since before it filed its complaint.[42]  *See, e.g., Pressure Prods.*, U.S. App. LEXIS 6132 at *24-25 (affirming denial of motion to amend because declarations defendant claimed in support of inequitable conduct allegation were publicly available within the file wrapper of the patent at issue; defendant could have obtained discovery on them at an earlier time and permitting the amendment would amount to undue delay and undue prejudice to the patent holder).  World Pac has filed an opposition to Viskase's motion to amend the pleadings (see ECF No. 115), but will substantively address the baseless allegations below.

Viskase's allegations of misrepresentations to the USPTO fall flat for a number of reasons.  Viskase essentially makes two arguments: (i) that inventor Tom Schäfer knew about polyvinylidene chloride (PVDC) coated, smoke-impregnated fibrous casings, and failed to disclose this information to the Examiner; and (ii) that prosecuting attorney William Schwarze misrepresented the cited U.S. Patent No. 4,446,167 ("Smith") with a submitted argument that

---

[42] Viskase argues that it could not have known that Mr. Schäfer worked for Tee-Pak (the assignee of the Smith patent) or that he had knowledge of PVDC coated, smoke-impregnated fibrous casings before his deposition testimony.  Firstly, Mr. Schäfer did not testify that he knew of the Smith patent or that he learned of smoke-impregnated PVDC-coated fibrous casings while he was employed at Tee-Pak.  Mr. Schäfer merely testified that he heard of PVDC coated, smoke-impregnated fibrous casings and that he heard they did not work.  Schafer Dep. at 222:14-225:13.  Secondly, if Viskase's own PVDC coated, smoke-impregnated fibrous casings were actually so well known in the market, as it argues, then every competitor would have that knowledge and there is nothing it could not have pled earlier.

43

"feigned ignorance" to the "nature" of the barrier coats of Smith.  World Pac addresses each in turn.

A finding of inequitable conduct requires an accused infringer to show that the applicant (1) made an affirmative misrepresentation or omission of a material fact, and (2) intended to deceive the PTO.  *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (internal citations omitted).  Viskase cannot show Tom Schäfer's alleged failure to cite a PVDC-coated, smoke impregnated fibrous casing was material, and cannot show that Mr. Schäfer intended to deceive the PTO as a result.  Mr. Schäfer testified that he did not think the PVDC-coated casings worked and he did not recall why his knowledge of such devices was not disclosed to the Patent Office.  Schäfer Dep. at 224:13-22.  Mr. Schäfer did not testify that he had any specific knowledge of a patent, publication, or any particular manufacturer's PVDC-coated fibrous casing having smoke.[43]  Mr. Schäfer testified only that "I was informed, yes, that fibrous casing impregnated with smoke and also fibrous casing coated with PVDC and impregnated with smoke was in the market," which demonstrates nothing more than a general knowledge of the marketplace.  Schäfer Dep. at 224:19-22.

Further, "information is material to patentability when it is *not* cumulative to information already of record or being made of record in the application."  37 C.F.R. § 1.56(b) (emphasis added); *see also Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 31 (Fed. Cir. 1999) ("an otherwise material reference need not be disclosed if it is merely cumulative of or less material than other references already disclosed").

---

[43]  Viskase did not even bother to take the deposition of the prosecuting attorney during the discovery period even though Viskase had complete knowledge of the prosecuting attorney since at least as early as October 2005.

The existence of plastic-coated, smoke-impregnated fibrous casings was squarely before the Examiner. Smith, cited by the Examiner, clearly recites the use of fibrous-reinforced regenerated cellulose casings capable of imparting liquid smoke to a foodstuff, and that such casings may include an outer "barrier coat." *See* U.S. Pat. No. 4,446,167 ("Smith") at col. 6, line 56-col. 7, line 15. To the extent the Examiner would not have understood the barrier coat of Smith to be a plastic material (which, as shown below, is highly unlikely), U.S. Pat. No. 5,698,279 ("Vicik") discloses in the background of the invention section that barrier coatings for fiber reinforced regenerated cellulose casings may be formed from PVDC. *See* col. 1, line 66-col. 2, line 15. Thus, any disclosure by Mr. Schäfer of such a casing would have been cumulative to the prior art already of record. Viskase is merely attempting to resuscitate its failed invalidity arguments based upon PVDC-coated fibrous casings and those with smoke added therein, apparently realizing that these arguments are without merit, particularly in light of the Court's claim construction of "plastic foil," which excludes coatings for not being "self-supporting." ECF No. 122 at 14.

Further, even if Mr. Schäfer's alleged failure to disclose his general, unconfirmed knowledge even met a threshold level of materiality, which it does not, Viskase cannot meet its burden to show an intent to deceive the USPTO by clear and convincing evidence. First, an intent to deceive cannot be inferred solely from the failure to disclose information; a factual basis must exist for finding deceptive intent. *Purdue Pharma, L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1133-34 (Fed. Cir. 2006) (quoting *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)).[44] Viskase has not provided *any* evidence of intent on the part of Mr. Schäfer, other than

---

[44] Indeed, even where highly material prior art is claimed to have been omitted, a party arguing unenforceability due to inequitable conduct must still show the patent holder's intent to deceive the Patent Office. *Optimum Corp. v. Emcore Corp.*, 2010 U.S. App. LEXIS 9193, *16 (Fed. Cir. May 5, 2010)

to refer to the comments in the public written record of Mr. Schwarze to the Examiner (which, as described below, is a mischaracterization of the prosecution history).[45] This bald assertion is insufficient to carry the heavy burden required to show inequitable conduct.

Viskase also attacks Mr. Schäfer and Mr. Schwarze as having misled the PTO because Viskase surmises that the addition of "plastic" to "impermeable foil" wrongly convinced the Examiner to allow the claims of the '613 patent.[46] Such an argument selectively plucks portions of the prosecution history completely out of context. First, the Examiner would never have permitted such an amendment to overcome the Smith reference because, as described above, it is clear that the "barrier coats" of Smith are plastic (fibrous casings would not provide a barrier layer, and the casings cannot be coated with metal or glass). *See also* Vicik at col. 1, line 66-col. 2, line 5 (a patent that was squarely before and reviewed by the Examiner describing plastic-coated fibrous casings).

Second, in the argument made to the Examiner, amendments to several claims are referenced with respect to arguing over the Smith reference, including new claims 13 and 14, which address lamination and extrusion of layers for adhesion, clearly signifying a difference from coatings. See '613 File History, at Supp. Am. of 10/24/2000, Ex. GGG at pp. 1-4. Mr. Schwarze provided a clear distinction for *all* of the claims over Smith to the Examiner asserting that "these new claims with their plastic foils clearly distinguish over the barrier coats of the above patent." *Id.* at p. 4. The argument is therefore meant to distinguish the plastic foils from the plastic barrier coats of Smith. An overall review of the prosecution history illustrates that the

---

(concluding that materiality of a reference alone cannot suffice to prove intent to deceive) (citations omitted).

[45] Ex. A to ECF No. 98 at 26-27.

[46] *Id.* at 27.

term "plastic" was included as part of the newly drafted claim 11 to add clarity to the claim language, and not as the sole point of distinction over Smith.

Viskase attempts to frame its argument by insinuating that Mr. Schwarze's statement that the "*nature* of the 'barrier coats' is unclear" necessarily refers to the material(s) of construction of the barrier coats.[47] This is inaccurate. The "nature" of an object refers to many features, and in the case of Smith, includes how the coating is applied to the fibrous layer, whether the coating is supported by a substrate or carrier layer, and the like.[48] Further, the Court, in its Order on claim construction, stated that this statement in the prosecution history is "ambiguous." ECF No. 122 at 14. Viskase cannot sustain the necessary levels of materiality and intent on such an ambiguous statement. Viskase's mischaracterization of the prosecution history is simply a veiled attempt to encompass prior art coated casings for its weak invalidity defense, and this inequitable conduct allegation is an incidental spin-off thereof.[49] Viskase never bothered to ask Mr. Schwarze or Mr. Schäfer during discovery what they respectively meant by this statement or how they understood the claims to distinguish the prior art within this argument - - probably because they knew it was completely innocuous and explainable.

---

[47] Ex. A to ECF No. 98 (emphasis added).

[48] Mr. Schwarze's statement regarding the "nature of the barrier coats" is factually accurate, and can hardly be said to amount to an affirmative misrepresentation on the part of the prosecuting attorney or the inventors. In any event, attorney argument merely attempting to distinguish the claims over prior art clearly before the Examiner cannot form the basis of inequitable conduct. *See Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007) (holding that an Office Action response consisting of attorney argument and an interpretation of the prior art failed to constitute an affirmative misrepresentation of material fact).

[49] In fact, this portion of the prosecution history has previously been analyzed by another competitor of World Pac several years prior to the present litigation, which came to the independent conclusion that plastic coatings had been disclaimed from the term "plastic foil," and not that World Pac had inserted "plastic" to avoid the prior art. REDACTED

47

### C. World Pac Will be Irreparably Harmed if an Injunction Does not Issue

The evidence introduced to date in this case shows how significant World Pac's harm will be if the injunction is not entered. Specifically, because Viskase has targeted World Pac's customers for its copy of World Pac's patented invention (*i.e.*, the VISCOAT casings), World Pac continues to lose market share every day that the VISCOAT casings remain on the market. Indeed, the evidence in this case shows how concerted Viskase's efforts have been to capture World Pac's sales and customers in this niche market.     REDACTED

To demonstrate that it would be irreparably harmed by Viskase's continued infringement in the absence of a preliminary injunction, a patentee can argue various non-exclusive factors to show that the alleged infringement of the patent has caused and continues to cause irreparable harm to the patentee in the absence of the issuance of a preliminary injunction. Such factors can include:

1. Whether the continuing infringement threatens the survival of the patentee's business;

2. Whether the alleged infringer and the patentee are direct competitors trying to influence the same group of customers.

3. Whether the continuing infringement would encourage others to infringe, or whether the issuance of an injunction would deter other existing or potential infringers and influence them to withdraw;

4. Whether the continuing infringement would erode patentee's position in the market; and

5. Whether the continuing infringement would injure any collateral benefit provided by the patent other than a right to receive money damages;

*See, e.g., Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456 (Fed. Cir. 1988) (articulating nine non-exclusive factors that supported a finding of irreparable harm, including that the infringer

48

has a very large presence in the same market, that the patent could help the patentee establish a market position, that the patent may lose its value by the time the litigation concludes, and that others likely could be encouraged to infringe if an injunction does not issue).

In the wake of the United States Supreme Court's decision in *eBay,* 547 U.S. at 392-94 (2006), the Federal Circuit has determined that irreparable harm can no longer be presumed merely upon the finding of likelihood of success of finding infringement. *Automated Merch. Sys. v. Crane Co.,* 2009 U.S. App. LEXIS 27667 at *9 (Fed. Cir. Dec. 16, 2009) (finding that the *eBay* decision "discarded" "the presumption of irreparable harm, based just on proof of infringement"). However, even without relying on a presumption of irreparable harm, the facts in this case demonstrate that World Pac has been harmed, and will continue to be irreparably harmed if Viskase is permitted to continue offering its version of World Pac's patented invention for sale to World Pac's largest customers and, therefore, undermine (and perhaps completely eviscerate) World Pac's client base and its ability to continue doing business. World Pac's argument herein is based on an evaluation of the specific factors identified below which demonstrate irreparable harm, and not on the strength of any presumption.

> 1. **Viskase's Continuing Infringement Injures any Collateral Benefit Provided by the Patent Other than a Right to Receive Money Damages**

This Court has recognized that monetary damages for infringement can be insufficient to fully compensate a patent holder for the infringement of its patent:

> It is well-settled that, because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money.

*See Techtronic Indus. v. Chervon Holdings Ltd.*, 395 F. Supp. 2d 720, 736 (N.D. Ill. 2005); *see also Hybritech,* 849 F.2d at 1457 ("If monetary relief were the sole relief afforded by the patent

statute, then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts.") (citing *Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985)); *accord Pittway v. Black & Decker*, 667 F. Supp. 585, 591 (N.D. Ill. 1987).

Moreover, the primary benefit afforded a patentee is the ability to exclude others from practicing the invention during the life of the patent. *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d at 1456-57. The trespass of this exclusive right cannot be compensated merely by monetary damages awarded at the end of a case. *Id.* Indeed, courts have concluded that while monetary damages may address prior infringement, they are wholly insufficient to compensate a patentee for the continued losses of sales during the pendency of the litigation and any other future infringement by this same party. *Id.*

REDACTED

If Viskase is permitted to continue taking sales from World Pac's four largest customers during the pendency of this litigation, the much smaller World Pac USA    REDACTED    may have to close its doors, a result which cannot be compensated by monetary damages awarded years from now after the litigation and appeals have been concluded. By the time this case proceeds to

judgment, the harm caused by Viskase's continued aggressive sales of its infringing VISCOAT

casing will stand, and World Pac may not recover financially from the theft of its valuable

intellectual property rights. As mentioned above at pages 18-19, World Pac's sales of its NPP

SUN SMOKE, SUN FLAVOR, and SUN CARAMEL casings are down on average [REDACTED] per

quarter compared to a year ago. See World Pac NPP Sales Data, Ex. XX at WP0018105. If

World Pac continues to lose sales to Viskase at just REDACTED customers who produce the

REDACTED

World Pac will no longer be profitable. See

World Pac NPP Projected Loss of Business, Ex. YY. And, if World Pac loses any other business

to Viskase,          REDACTED          which would likely lead to World Pac closing its

doors in the USA. *Id.*

  In this case, the award of monetary damages would be similarly insufficient to

compensate World Pac for damages if Viskase is permitted to continue marketing and selling the

VISCOAT products in World Pac's niche market. Indeed, public records and witness testimony

indicate that Viskase's financial condition is unstable and Viskase has obtained protection from

its creditors through multiple discharges in bankruptcy in the last two decades, thus suggesting

that recovering monetary damages as may be difficult. *See* Dun &Bradstreet Business

Information Report on Viskase Companies, Inc., Ex. J; Nicholson Dep. at 19:8-21:1.

   **2.**  **Viskase's Continuing Infringement Likely Could Encourage**
      **Others to Infringe**

As the testimony of Viskase's various witnesses demonstrates,          REDACTED


that World Pac's customers may be interested in purchasing instead of World Pac's

51

patented product.  Were this Court to permit Viskase's continued infringement to proceed

unimpeded until a final determination can be made on the various infringement claims, other

World Pac competitors may view the field as open territory and susceptible to further instances

of copy-cat infringing products, thus eviscerating World Pac's goodwill and the value of its

patent on multiple fronts.

World Pac has refused to license the '613 patent (or any related patent), which also shows

that its right to exclude others would be impaired and not compensable by monetary damages.

*See* Def.'s Resp. to First Rogs, Ex. B at 13-14.  For instance, at one point, another of World

Pac's competitors, Kalle, approached World Pac to obtain a license to develop and distribute a

plastic casing product based on World Pac's '613 patent.  *Id.*  World Pac declined to license

Kalle (*id.*); however, should Viskase not be enjoined and continue to actively market its

infringing VISCOAT product, others like Kalle may be emboldened to infringe the '613 patent

so they can compete with World Pac at the expense of World Pac's right to exclude inherent in

its patent.

**3.    Viskase's Continuing Infringement Threatens Survival of World Pac's Business**

As more fully articulated above, more than REDACTED of World Pac's business relies on

these specific World Pac casings (*see* Vaughn Decl., Ex. G at ¶ 9), such that disruptions in the

sales of the World Pac plastic casings can have a drastic detrimental effect.  Indeed, Viskase has

already taken substantial business at one of World Pac's four largest customers, REDACTED

If

52

Viskase is permitted to continue to benefit from its infringing activities by encroaching on World Pac's market, the much-smaller World Pac USA[50] may cease to operate.

### 4. World Pac and Viskase are Direct Competitors Trying to Influence the Same Group of Customers

Viskase and World Pac are direct competitors for the same customer base. In cases where the parties to an infringement litigation are direct competitors, irreparable harm can result from any market share that the accused infringer may obtain, or any customer relationships that the accused infringer may form or improve, at the expense of the patent holder if not enjoined. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) (concluding that other forms of irreparable harm to a competitor included "irreversible price erosion, loss of good will, potential lay-offs of [patent holder's] employees, and the discontinuance of clinical trials that are devoted to other medical uses" for a brand-name patented drug); *see also Purdue Pharma L.P. v. Boehringer Ingelheim*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (affirming lower court's decision that irreparable harm could result from "likelihood of price erosion and loss of market position without corresponding market expansion from the introduction of [the infringer's] product").

In its Complaint, Viskase acknowledges and admits that it competes in the casing marketplace with Defendants. ECF No. 1 at ¶ 11 ("Viskase competes with World Pac in the casing market. Both Viskase and World Pac make casings impregnated with coloring and/or flavoring agents and sell such casings to food processors."). Thus, the direct competition of the parties weighs in favor of granting injunctive relief because of the danger of immediate irreparable harm to the Defendant from Viskase's continued infringement of the '613 patent.

---

[50] Viskase argues that multi-national World Pac International AG ("World Pac AG") will be able to weather the storm of a litigation. However REDACTED World Pac is a self-supporting profit center in the United States. It operates from receivable sales income and pays its vendors from that receivable income including World Pac AG. Vaughn Dep. at 121:22-122:8.

The evidence of record clearly demonstrates that                REDACTED

which would

result in Viskase honing in on a large percentage of World Pac's sales.  The Parties' witnesses all

agreed that they call on the same or similar clients and attend the same trade shows to influence

the same group of customers. Strenk Dep. at 52:21-53:22, 83:6-85:4; Sherry Dep. at 66:2-67:16.

Moreover, since Viskase and World Pac are direct competitors for the same customer

base, a decision to permit Viskase to continue expanding its sales relationships in this niche

market based upon its infringing product will harm World Pac's long term relationship with the

same customers in this niche market and all other markets that World Pac may wish to enter with

these customers.  World Pac may never be able to restore such relationships, because this casing

is the only contact World Pac has with these customers, especially if Viskase continues to use

every opportunity to delay resolution of this dispute during this litigation.  In addition, if Viskase

is permitted to continue marketing its infringing VISCOAT casing, it will have circumvented

World Pac's right to a limited monopoly and its right to exclude others from practicing this

invention pursuant to the Patent Act.

### 5.    Viskase's Argument that World Pac Delayed in Alleging Infringement is Simply Wrong

Viskase has suggested that World Pac had an obligation to file suit in 2005 when it first

learned about the existence of the VISCOAT casings.[51]  Indeed, Viskase wishes this Court to

believe that World Pac *knew* that Viskase was selling its VISCOAT casing product as early as

---

[51]   Viskase's counsel has asserted during hearings before the Court that the "offer for sale" in 2005 constituted an infringement, for which World Pac could have brought a litigation. *See* e.g., Transcript of Hearing 12/8/2009, Ex. III at 15:21-22.

2007[52] (and perhaps as early as the 2005 AMI Show) and yet failed to take any action to enforce its patent rights until it filed its counterclaim in November 2009.[53] This argument completely misrepresents the facts of record and ignores the fact that until World Pac had been able to test a sample of the VISCOAT casing, it had no reasonable good faith basis on which to file an enforcement action without incurring Rule 11 sanctions.

**a)      Without a Sample it Could Test, World Pac was Precluded from Bringing Suit without Inviting Sanctions**

World Pac has consistently demonstrated that it was incapable of bringing an infringement action against Viskase until it had sufficient information upon which to evaluate whether the VISCOAT casing actually infringed on its patent. *See, e.g.*, pages 9-10, 12-14, *supra*. As a result, while the information World Pac had was sufficient to request a sample for evaluation and to send an enforcement letter essentially based on what World Pac knew at the time and requesting further information, World Pac was precluded from enforcing its patent rights in court because it lacked the ability to test the allegedly infringing product and determine whether it read on the claims of the '613 patent.

In a similar case, *View Engineering, Inc. v. Robotic Vision Systems*, the patent holder was sanctioned for alleging infringement of eight of its patents based on publicly-available literature, but not first testing a sample to support its arguments. *View Eng'g*, 208 F.3d 981, 983-86 (Fed.

---

[52]   Viskase's reliance on its allegation that the VISCOAT casing was displayed at the 2007 AMI Show is a red herring. Merely displaying a prototype of a product with brochures at a trade show – even where sales representatives attend to discuss the product with potential customers – does not rise to the level of an infringing use required by 35 U.S.C. § 271(a). *Med. Solutions, Inc. v C Change Surgical LLC*, 541 F.3d 1136, 1140 (Fed. Cir. 2008) ("'mere demonstration or display of an accused product, even in an obviously commercial atmosphere' is not an act of infringement for purposes of § 271(a).") (quoting *Fluid Mgmt. Ltd. P'ship v. H.E.R.O. Indus.*, 1997 U.S. Dist. LEXIS 2728 at *4 (N.D. Ill. Mar. 11, 1997). At a minimum, solicitation of purchase orders at the 2007 AMI Show would have been required to evidence an actionable infringing use – a fact which is not in evidence in this case. *Id.* at 1140 n.3.

[53]   Ex. A to ECF No. 98 at 29-34.

Cir. 2000).  Courts have differed about what constitutes a "reasonable examination" before a

patent infringement claim is filed in federal court, but it is clear that at a minimum, the patent

holder must obtain a sample of the accused product or device and examine it to see if it does, in

fact, infringe.  *See, e.g., Judin v. U.S.*, 110 F.3d 780, 784 (Fed. Cir. 1997) (requiring comparison

of accused device to patent claims "before the suit is filed, not after"); *Micromesh Techn. Corp.

v. Am. Recreation Prods., Inc.*, 2007 U.S. Dist. LEXIS 64241, *8, *12 (N.D. Cal. Aug. 30, 2007)

(rejecting pre-filing investigation that relied solely on obtaining a sample of the accused product:

"plaintiff was required to engage in some degree of competent analysis of those samples before

filing suit.  Apart from obtaining the product sample and preparing a boilerplate claim chart,

plaintiff has provided no evidence that its investigation was reasonable").

To the contrary, World Pac's ability to file suit and allege infringement was impeded by

its inability to confirm whether the product at issue (VISCOAT casings), in fact, included all of

the elements of claim 1 of the '613 patent in the absence of a sample to analyze and test.  World

Pac would be placed in exactly the same situation as the *View Engineering* and *Micromesh*

patent holders had it filed an enforcement action or even its counterclaims in the instant action

before it had tested a sample of the VISCOAT casings: to wit, World Pac could have been

subject to significant Rule 11 sanctions for filing suit without having a reasonable basis to do so.

Viskase's own expert, with a PhD from MIT in polymeric materials, admitted that she

could not tell the materials of construction of a random casing (*i.e.*, one shown to her without

description), from 3½ feet away and even when she handled it herself.  Reitman Dep. at 278:6-

279:9.  It is ridiculous for Viskase to assert on one hand that World Pac had enough information

to bring a lawsuit in 2005 by merely observing a [non-working] casing in a display case from 20

feet away, but then criticizing that World Pac did not have enough evidence to make its

counterclaim with scientific test data of samples obtained without Viskase's assistance. *See e.g.*, Transcript of Hearing 12/8/09, Ex. III at 16:21-25 ("We don't believe that the testing they did is a sufficient basis to bring this lawsuit"). Viskase cannot "hide the ball" and then fault World Pac for failing to take action.

In light of Viskase's repeated denials that the VISCOAT casings infringed World Pac's '613 patent in any way and repeated refusal to provide a sample in response to affirmative requests, its significant efforts to hide its casing from World Pac representatives, and World Pac's inability to test the casing in preparation to file suit, World Pac's ability to conduct any pre-suit investigation was severely constrained. Schäfer Dep. at 355:18-22; Vaughn Dep. at 209:21-212:4. The evidence of record demonstrates that Viskase undertook concerted efforts to shield its VISCOAT casings from scrutiny and evaluation by World Pac, even in response to pointed requests for a sample by World Pac counsel to evaluate whether World Pac truly had a claim for infringement.[54] Further, World Pac could not obtain a sample on the market because substantially all of the sales of VISCOAT casings prior to this litigation had been to a single customer. Summary Sales Data, Ex. DD at VCI017686.

Viskase's counsel told World Pac's counsel in early 2006 that World Pac does not have a case for infringement and that the VISCOAT product does not include a fiber layer. Schwarze Dep. at 47:14-49:12 (reading from his contemporaneous notes of a telephone conversation with

---

[54] *See* pages 9-10, 12-14, *supra*; Nicholson Dep. at 136:12-137:10　　REDACTED *id.* at 279:17-280:7 (confirming that World Pac's counsel had requested a sample and that Viskase had refused to provide one); REDACTED letter from Bobrowicz to Schwarze, dated 1/9/2006, Ex. BB at WP0006442 (letter from Viskase's in-house counsel stating that Viskase does not have a sample); letter from Kozak to Schwarze, dated 2/10/2006, Ex. CC at WP0006448 (letter from outside counsel refusing to provide a sample and demanding factual support for infringement allegations); Schwarze Decl., Ex. AA at ¶¶ 5-6 (describing conversation with Viskase's outside counsel Kozak refusing to provide sample and asserting they will not make it easy for World Pac to obtain one).

Mr. Kozak in 2006). He also admonished that he doesn't agree World Pac has a case and that "when [you] see the product, [you]'ll realize it." *Id.* Yet, ridiculously, Mr. Kozak and Viskase refused to provide a sample when World Pac's counsel Mr. Schwarze told them that if they provided a sample the whole matter could be resolved. *Id.*

Therefore, any perceived delay in enforcing its patent rights is illusory and cannot be attributed to World Pac's actions or omissions. Instead, World Pac filed its infringement claims promptly after it tested the casing and concluded that despite Viskase's repeated denials, the product clearly infringed the '613 patent. There has been no delay in seeking enforcement of the '613 patent.

**b)**    **Courts Have Granted Injunctions Even Where Delay Before Filing Was Substantial**

Courts have long recognized that a period of delay between the commencement of infringement and the request for an injunction is only one factor to be considered in the irreparable harm analysis. *Hybritech*, 849 F.2d at 1457. Thus, delay is clearly not dispositive of the issue of irreparable harm. *See Cummins-Allison Corp. v. Glory Ltd.*, 2003 U.S. Dist. LEXIS 2151 at \*31-32 (N.D. Ill 2003) (noting that factors to be considered in preliminary injunction motions, "taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested") (internal citations omitted); *Read Corp. v. Viper Int'l*, 1996 U.S. App. LEXIS 3847 at \*3 (Fed. Cir. 1996) (finding that in context of preliminary injunctions, "[n]o particular factor is dispositive; rather, the court must weight and measure each factor against the others and against the relief requested"). The courts not only look at the length of the delay, but also the circumstances involved in creating the delay. *See, e.g., Whistler Corp. v. Dynascan Corp.*, 1988

58

U.S. Dist. LEXIS 14956 at *6 (N.D. Ill. 1988) (considering existence of copending litigation involving same patent in analyzing issue of delay).

Indeed, courts have granted preliminary injunctions even when there is a several-year gap between the initial act of infringement and the motion for preliminary injunction where the patentee perfected its claim to a "reasonable likelihood of success on the merits" of a patent infringement claim. *See e.g., Henkel Corp. v. Coral, Inc.*, 754 F. Supp. 1280, 1309 (N.D. Ill 1990) (concluding that there was no unreasonable delay in filing for preliminary injunctive relief where patentee "prudently undertook to confirm infringement by obtaining and testing competitive samples, a time consuming process"); *Jacobson v. Cox Paving, Co.*, 19 U.S.P.Q.2d 1641, 1656 (D. Ariz.), *aff'd*, 21 U.S.P.Q.2d 2040 (Fed. Cir. 1991) (concluding that irreparable harm could be shown even where patentee delayed filing until the conclusion of another litigation that was necessary to support its claim of a reasonable likelihood of success on the merits); *Whistler Corp. v. Dynascan Corp.*, 9 U.S.P.Q.2d 2087, 2088 (N.D. Ill. 1988) (finding delay reasonable where patentee waited to file suit until it adjudicated other suit which would establish likelihood of success); *accord Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 448 (W.D.N.Y. 2008) ("[A] delay caused by a plaintiff's good faith efforts to investigate a[] [trademark] infringement should not rebut the presumption [of irreparable harm].") (quoting *Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994)); *FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539, 582 (E.D. Pa. 2005) ("Moreover, to the extent that delay can justify denial of a motion for a preliminary injunction, a delay caused by a plaintiff's good faith efforts to investigate an infringement or to determine how serious an infringement is does not preclude a finding of irreparable harm.") (internal citations omitted).

The evidence in this case aptly demonstrates that World Pac did not delay and was justified in not filing an infringement lawsuit until after it obtained a sample of the potentially infringing VISCOAT casings and performed tests to determine its composition.

### c)   Even Viskase's Expert Concedes that Materials of Construction Could Not be Determined Without Sophisticated Tests

Viskase has argued that World Pac *should have known* that Viskase continued to market an infringing casing under the VISCOAT name beginning in 2007.[55] Again, Viskase ignores substantial record evidence that World Pac had no proof until the filing of this lawsuit that Viskase marketed a competing casing, even if it had observed a sample of the casing from afar by seeing it at the 2007 AMI Show. As described above, even Viskase's own expert conceded that it is impossible to determine from a mere visual inspection what materials of construction make up a plastic and/or multilayer plastic/fibrous casing. Reitman Dep. at 278:6-279:9. Dr. Reitman further explained that she would require, at a minimum, the use of sophisticated machines, such as a Fourier Transform Infrared (FTIR), *i.e.*, highly technical spectroscopy analysis, to determine or even get a glimpse of what the components of a plastic casing were and that a detailed inspection and analysis of the product would be required before reaching any conclusion. *Id.* at 279:10-280:4. As this Court has previously held, "[i]n light of [the alleged infringer's] prior assertions that it had been selling a noninfringing product, [the patentee] *prudently* undertook to confirm infringement by obtaining and testing competitive samples, *a time consuming process*." *Henkel*, 754 F. Supp. at 1309 (emphasis added).

This is further evidenced by the work of Dr. Menna, who testified that the "total time [of his analysis] was maybe spread out, you know, a little bit, but I think it was maybe a few days"

---

[55] Ex. A to ECF No. 98 at 32-33.

which "expressed in hours" totaled about eight to ten hours, because of all of the various

necessary steps such as de-lamination, FTIR, microscopy, and the like. Menna Dep. at 65:2-24.

Even Viskase's witness, Dr. Merritt, testified that he spent a significant amount of time trying to

deconstruct the World Pac casing and just could not figure out the composition of one of the

layers. Merritt Dep. at 131:8-134:8. Thus determinations regarding the constructions of casings

are not simple and quick matters, but involve lengthy studies.

     In addition, World Pac sales representatives similarly testified that they were unable to

determine whether the casing that Viskase sought to market under the VISCOAT (or

"VISKOTE") name was the same casing that third-party Larry Passmore told them about during

the 2005 AMI Show. Mogensen Dep. at 76:13-76:16 ("nobody really had any proof or anything

that it was actually a copy"), 89:4-12 ("it was not known what type of material it was"); Hiebing

Dep. at 141:23-142:6 ("If we're talking about the Viscoat casing, we were unaware that it was

being promoted there [at the 2007 AMI Show]); Email from Gilewski, dated 7/2/2007, Ex. MM

at WP0002380 (Referring to the casing product tested         REDACTED


)[56]; Sales Recap,

dated 6/25-6/29 and 7/2-7/6/2007, Ex. KK at WP00016759-60 (confirming that by June of 2007,

World Pac was still trying to obtain a sample of the "Viskote" caramel casing to determine its

structure); Email from REDACTED to Gilewski, dated 6/9/2008, Ex. PP at WP0004520-23

           REDACTED

         These facts further support World Pac's position

---

[56] A pure polyamide casing like VISFLEX and VISMAX does not include a fibrous inner absorbent layer.

that it is inappropriate to try to impute "knowledge" of a potentially infringing product based on uncorroborated rumors of what may have existed at the time. Consequently, none of Viskase's arguments on this point should be credited.

> **d)** **Viskase Inappropriately Relies on Trade Show Displays to Support an Inference that World Pac Delayed Enforcing its Rights.**

Viskase emphasizes its appearance at trade shows in foreign countries and suggests that such appearances were sufficient to put World Pac on notice, beginning in 2007, that Viskase was selling the VISCOAT casing in the U.S. market.[57] This argument is completely contrary to U.S. law. Instead, it is axiomatic that the alleged infringer's use, sale, offering for sale and marketing products of an alleging infringing product **outside of U.S. boundaries** cannot be used as evidence of infringement of a U.S. patent. 35 C.F.R. § 271(a) ("whoever without authority makes, uses, offers to sell, or sells any patent invention, *within the United States*, infringes the patent."). Moreover, the Federal Circuit similarly disregarded evidence of foreign trade show attendance in a patent infringement suit, explaining "[t]hese extraterritorial activities, however, are irrelevant to the case before us because 'the right conferred by a patent under our law is confined to the United States and its territories.'" *Rotec Indus., Inc. v. Mitsubishi Corp, et al.*, 215 F.3d 1246, 1251 (Fed. Cir. 2000) (quoting *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 650 (Fed. Cir. 2006)). As a result, Viskase's trade show activities in foreign countries – regardless of whether World Pac knew about them or not – are irrelevant to a

---

[57] Ex. A to ECF No. 98 at 11.

determination of whether World Pac was effectively on notice at that time that Viskase sought to

direct its infringing VISCOAT casing into the U.S. market.[58]

### 6.   Duplication of Unique Features of World Pac's Casing Further Supports Finding of Irreparable Harm

Irreparable harm can also be demonstrated where the patent and World Pac's covered

products have a feature that is unique in the marketplace. *Techtronic Indus.*, 395 F. Supp 2d at

737.  Here, the '613 patent covers the unique high oxygen barrier that World Pac' casing

products use.  Schäfer Decl., Ex. RR at ¶ 13.  Thus, by its infringement of the '613 patent,

Viskase is trying to unfairly take advantage of World Pac's innovation to expand its business at

World Pac's expense.                                                    REDACTED


Both West Liberty and Smithfield have

been customers of World Pac in connection with its products covered by the '613 patent that

compete with Viskase's VISCOAT casings.  Schäfer Decl., Ex. RR at ¶ 9.  The fact that Viskase

has been successful in encroaching those relationships and selling competing products that are

covered by the '613 patent further supports a finding that irreparable harm exists.  Such intrusion

into World Pac's business has and will continue to result in irreparable harm (since monetary

damages would not suffice) if Viskase succeeds in usurping any more of World Pac's market

share and establishing or deepening relationships with World Pac's existing clients through the

unfair use of Defendant's protected innovation.

---

[58] Notably, Viskase for the first time advertised in a German trade magazine the VISCOAT casing in April 2010.  World Pac International AG filed an action against Viskase in Germany, and at the 2010 IFFA show in Germany in early May, and Viskase did not display the VISCOAT product.

**D.     Balance of the Hardships Weighs in World Pac's Favor**

In determining whether to grant a preliminary injunction, the Court must balance the hardships suffered by World Pac if a preliminary injunction does not issue against those that would be suffered by Viskase if the injunction is granted. *Abbott Labs.*, 500 F. Supp. 2d at 844. In this case, the balance of hardships weighs in favor of World Pac.

As previously outlined above, World Pac's continued business would be severely compromised if Viskase is permitted to continue manufacturing, marketing, selling and distributing its infringing VISCOAT casings.  In contrast, however, the hardship that Viskase would suffer from being required to recall its infringing product from the market would be minimal, and in any case could have been avoided completely if Viskase had provided a sample product for analysis in 2005, or avoided reverse engineering World Pac's patented invention to create a competing product, especially in light of World Pac's counsel's October 2005 letter warning of potential infringement and seeking further information. *See* Letter from Schwarze to Viskase, dated 10/27/2005, Ex. X at WP0017285-87.  Viskase knew about World Pac's claims of infringement over four years ago, before it had commercialized a product that read on World Pac's patent. ECF No. 1 at ¶ 12.  Declining to introduce it to the market thereafter would have resulted in virtually no cost to Viskase, but instead, it forged ahead full steam to create a plastic casing with an absorbent inner layer to impart color and/or smoke into customers' meat and cheese products that conflicts directly with World Pac's patent.

Courts have found that where the harms articulated by a party in a preliminary injunction context could have been avoided by that party's own action, the harms are in fact "self-inflicted" and weigh against the party during the court's balancing of the respective harms. See *Baskin-Robbins Inc. v. Patel*, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003) ("If the evidence presented at the

hearing bears out these facts, any harm experienced by defendant may be found self-inflicted and weigh against him in the balance of harms."); *Henkel*, 754 F. Supp. at 1323 ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.") (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F. 2d 995, 1003 (Fed. Cir. 1986)).

In this case, demanding that Viskase recall the VISCOAT casing products will not substantially impact its business as a whole. Viskase is a large company, with 1300 employees and multiple product lines,  REDACTED

*See* Viskase Web Site, Ex. I; Sherry Dep. at 70:15-21      REDACTED

Moreover, Viskase's own public statements support World Pac's understanding that Viskase's VISCOAT casings are a "new" product. Schäfer Decl., Ex. RR at ¶ 15. Thus, Viskase has engaged in no long-term reliance on maintaining an established client base with the infringing product. In contrast, as explained above, the World Pac's products covered by the '613 patent and which directly compete with Viskase's accused products constitute the vast majority of the World Pac's U.S. sales (*see* Vaughn Decl., Ex. G at ¶ 9), so the balance of hardships weighs heavily in favor of World Pac.

Viskase can still sell what it touts as the MP fibrous casing[59] and its pure plastic casing with smoke, the VISFLEX, since it asserts that these products are equivalent competitive products. *See* Sherry Dep. at 23:16-21. Given that Viskase made an affirmative choice to develop a product that copied the pertinent features of World Pac's patented casings – even after

---

[59] At the outset of this litigation, World Pac through its counsel stated that it would withdraw its motion for a preliminary injunction if Viskase would switch back to the MP PVDC coated fibrous casing. Viskase, tacitly acknowledging that the MP fibrous casing does not work and demonstrating the VISCOAT is functionally a different product than its old MP fibrous casing, did not agree to do so.

Viskase was made aware of World Pac's '613 patent – Viskase should not be shielded from the consequences of its actions based on some [mis]calculated risk. Any harm it would claim as a result of the imposition of an injunction are "self-inflicted" and should weigh against it in the balance of harms. By way of comparison, World Pac is an eight-person company with essentially two products; the patented product makes up REDACTED of its sales each month. *See e.g.*, Vaughn Decl., Ex. G at ¶ 9.

**E.      Impact of the Injunction on the Public Interest is Favorable to World Pac**

When a patent issues, it conveys a fundamental right to the patent holder to exclude others from practicing the claimed invention. U.S. Const., Art. I § 8. Injunctive relief is available as a means to prevent the violation of a patent holder's rights. 35 U.S.C. § 283. Thus, Congress has made the legislative determination that injunctive relief is an appropriate remedy to address infringement of patents, and therefore, it is in the public interest to enforce patents accordingly. Courts have similarly held that "an injunction will serve the public interest by protecting, and, therefore, encouraging research and development efforts leading to patent protection." *Henkel Corp.*, 754 F. Supp. at 1309.

Many courts have determined that protecting a patent from continued infringement during the pendency of litigation is a profound public interest, and perhaps more valuable than money damages for past infringement because "the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech*, 849 F.2d at 1456-57. Even where the alleged infringing product benefits the public, the product can be recalled from the market if it infringes when "the public interest in enforcing valid patents outweighed any other public interest considerations." *Id.* at 1458 (ordering that certain of defendant's medical test kits be

recalled from the market as part of the preliminary injunction, but excluded specific cancer and hepatitis test kits from the recall on public policy grounds).

Moreover, the Northern District of Illinois has previously granted a preliminary injunction in a patent case in which it ruled that "[t]o the extent that this Court has found that the patents in suit are valid, the public interest is best served by enforcing them." *Ranbaxy*, 2005 U.S. Dist. LEXIS 27753 at 102. In addition, the court has previously concluded that "the focus of the district court's public interest analysis should be whether there exists some <u>critical</u> public interest that would be injured by the grant of preliminary relief." *Abbott Labs.*, 500 F. Supp. 2d 845 (N.D. Ill. 2007) (emphasis added). Thus, the court has consistently determined that it is in the public interest to safeguard the intellectual property of innovators, and courts have concurred in this judgment by granting preliminary injunctions.

In this case, the litigants are private companies. The VISCOAT casings are products whose sales do not have a public interest of great importance, and are not directed to a medical product which is important to maintain public health. In addition, World Pac practices the invention and make various competing products to Viskase's VISCOAT products. As a result, the public will not suffer any deprivation if Viskase is enjoined. Thus, not only is the enforcement of the '613 patent in the public interest, but also there is no critical public interest that would be injured by the issuance of a preliminary injunction against the Viskase's infringing activities.[60]

---

[60] Viskase has previously misstated the law in arguing that "the public interest in protection of patent rights is counterbalanced by the alleged infringer's right to compete." Ex. A to ECF No. 98 at 38 (citing *Illinois Tool Works, Inc. v. Grip-Pak Inc.*, 906 F.2d 679, 684 (Fed. Cir. 1990)). While World Pac certainly agrees that the public interest in protecting patent rights is not absolute, it disagrees wholeheartedly that a "right to compete" would encompass a right to reverse engineer, copy and/or distribute a product that infringes a valid U.S. Patent. Accordingly, in light of the great weight of evidence that supports the granting of the preliminary injunction in this case, to the extent that Viskase

## IV.    CONCLUSION

As demonstrated, the evidence of record clearly supports the imposition of a preliminary injunction in this case.  Specifically, World Pac can demonstrate likelihood of success on the merits of its counterclaims, in that the '613 patent is valid in view of the inadequate challenge made by Viskase and likelihood of infringement is demonstrated by their various analyses of Viskase's casing and the similarities it bears to the claims and specifications described in the '613 patent.  Similarly, the record amply supports World Pac's assertions that monetary damages would be insufficient to remedy the wrongs, that World Pac has been, and continues to be, irreparably harmed by Viskase's continued infringement of the '613 patent, and that the preliminary injunction in this case should be granted to support the public's interest in protecting the exclusivity and value of patent rights.

Accordingly, World Pac respectfully requests that this honorable Court grant its motion for preliminary injunction pending a full trial on the merits of its infringement counterclaims and order Viskase to immediately cease making, using, selling, offering for sale, and/or importing in and into the United States the Viskase VISCOAT SMOKE MASTER and COLOR MASTER casing products, or any other substantially similar products that may be disclosed before trial; and order Viskase to issue a recall of any VISCOAT products currently on the market.

---

raises this argument again in its substitute brief in opposition to the preliminary injunction.  This argument on the public interest should be found inadequate to rebut World Pac's clear showing.

Respectfully submitted,

Dated: <u>May 23, 2010</u>

/s/ Jacqueline A. Criswell
Jacqueline A. Criswell (ID No. 6180148)
Tressler, LLP
233 S. Wacker Drive
22nd Floor
Chicago, Illinois 60606
(312) 627-4003 (tel)
(312) 627-1717 (fax)
jcriswell@tresslerllp.com

John D. Simmons *(admitted pro hac vice)*
Stephen E. Murray *(admitted pro hac vice)*
Panitch Schwarze Belisario & Nadel LLP
One Commerce Square
2005 Market Street, Suite 2200
Philadelphia, PA 19103-7013
(215) 965-1330 (tel)
(215) 965-1331 (fax)
jsimmons@panitchlaw.com
smurray@panitchlaw.com

*Attorneys for Defendants World Pac International AG
and World Pac International USA, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2010, I electronically filed Defendants' Combined Memorandum

of Law in Support of Their Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF

system which will send notification of such filing(s) to the following:

John W. Kozak
David M. Airan
Nancy J. Gettel
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza
Suite 4900
Chicago, IL 60601-6780
(312) 616-5600 (tel)
(312) 616-5700 (fax)


_____/s/ Jacqueline Criswell_____
Jacqueline A. Criswell (IL #6180148)
Tressler LLP
233 South Wacker Drive
22nd Floor
Chicago, IL 60606
(312) 627-4000 (tel)
(312) 627-1717 (fax)
jcriswell@tresslerllp.com

John D. Simmons (pro hac vice)
Stephen E. Murray (pro hac vice)
Panitch Schwarze Belisario & Nadel LLP
One Commerce Square, Suite 2200
2005 Market Street
Philadelphia, PA 19103
(215) 965-1330 (tel)
(215) 965-1331 (fax)
jsimmons@panitchlaw.com
smurray@panitchlaw.com